MARGARET WHALEN *vs.* GEORGE H. OLMSTEAD & OTHERS.

New Haven & Fairfield Cos., Oct. T., 1891. ANDREWS, C. J., CARPENTER, SEYMOUR, TORRANCE and FENN, Js.

It is provided by Gen. Statutes, § 3655, with regard to "homes for dependent and neglected children," that there shall be provided in each county "one or more places of refuge, to be known as temporary homes;" that the commissioners of the county, with one member of the state board of charities and one member of the state board of health, shall be a board of management for the temporary homes of the county; that dependent and neglected children between the ages of two and sixteen may be placed in such homes, and that they may be committed to them by courts of probate until they are sixteen years old; and that the homes shall be used only for " the temporary protection of children for so long a time only as shall be absolutely necessary for the placing of the child in a well selected family home." A girl eight years old was regularly committed to a temporary home, at the request of its mother, who was a widow unable to provide for the child, until it should become sixteen years of age, unless sooner discharged by the board of management. The mother was of the Catholic faith, as had been the child's father, and she had been christened in it, but the mother knew, when she had the child committed, that she might be brought up a Protestant. The board received the child, and placed her in a good family, where she was very kindly treated and where she remained a year before any demand that she should be given up was made, and was still there. The woman with whom she lived was a Protestant and generally took the child with her to the Methodist church. A year after the commitment a Catholic priest made application to the board of management for the child, in behalf of the mother, and after a long negotiation and correspondence the mother brought a writ of *habeas corpus* against the board of managers for the unlawful detention of the child. The priest had offered to place her in a Catholic orphan asylum, and to see that she was well provided for, and was himself a man of good repute and ample means. Held that the court could not upon these facts regard the child as unlawfully detained.

The state has a right to thus interfere for the protection of neglected children, and its action in such a matter is not to be set aside upon the mere demand of a parent asserting his natural rights.

The managers of the temporary homes ought not, except in very peculiar circumstances, to interfere with, or fail to provide proper opportunities for, the intercourse of the parents with the children under their care.

The court did not regard the board as having abused its discretionary power in the management of the child or as having erred in judgment.

Whether if it had done so a writ of *habeas corpus* would have been a proper remedy: *Quære*.

[Argued October 29th—decided December 5th, 1891.]

HABEAS CORPUS; brought to the Superior Court in Fairfield County, and reserved, on a finding of facts, for the advice of this court. The case is sufficiently stated in the opinion.

*L. N. Middlebrook* and *J. J. Phelan*, for the plaintiff.

*D. B. Lockwood* and *A. B. Beers*, for the defendants.

FENN, J. This case comes before us upon a reservation. The action is habeas corpus, brought by the plaintiff as mother and lawful guardian of Josie Barry, a girl aged eleven years, against the defendants, who are the board of management of the temporary home for dependent and neglected children in Fairfield County.

The facts found by the court below, upon the issue properly presented by the pleadings, are in substance as follows: The child was duly committed to the defendants, September 6th, 1888, by order of a mittimus of the city court of the city of Bridgeport, at the request of the plaintiff, who, in making such request, which she did on account of poverty, being in some degree chargeable to the town of Bridgeport where she resides, supposed the child, when so committed, would be brought up a Protestant. In August, 1889, application was made by Rev. James B. Nihill, a Catholic clergyman, in behalf of the mother, to the board, to place the child in the home of the mother, subject to the supervision of the board. This request was not granted, the child having in fact, before that time, been placed in the family of Mrs. Almira Wooster, in Naugatuck, where she still remains, and is most kindly and well cared for.

The child had been christened in the Catholic faith, and the mother preferred that it should be brought up in that faith, being that of its father, then dead, as well as her own.

Finding that Rev. Father Nihill was willing, if he could ob-
tain the child, to place it in the St. Francis Orphan Asylum
in New Haven, a Catholic institution of high character, and
to support it there at the expense of the parish, she said to
him that she would give him the whole charge of the child,
and did give him full authority, so far as she was able, for
such purpose.   He thereupon went to the board and desired
the surrender of the child to him for that purpose, which
was refused.   In fact Mrs. Wooster is a Protestant and has
attended the Methodist church with the child.   The child
itself has never expressed any wish upon the matter, and
until the spring of 1890 Mrs. Wooster did not know that the
child was of Catholic parentage.   Since knowing that the
child was of such parentage, Mrs. Wooster has said that, while
Josie remained with her, she should prefer that she should
attend church with her, that is, at the Methodist church.
The board has never interfered with the religious training
of the child and has no intention of doing so.   A previous
action of habeas corpus, upon the trial of which the fore-
going facts appeared, having been dismissed in June, 1890,
on the 28th of that month Father Nihill addressed to the de-
fendants a letter, containing a power of attorney from the
plaintiff, by authority of which he made demand for the full
release of Josie Barry, adding :—" The purpose of this appli-
cation and demand being, that said Margaret Whalen desires
to resume her parental obligations, and through me, and I
for myself, giving full assurance and security to you that
said Josie Barry will hereafter be provided for, maintained
and educated in a suitable and proper manner, at the St.
Francis Orphan Asylum at New Haven, Conn." This was
the beginning of a somewhat voluminous correspondence, of
a formal nature, extending until December 3d, 1890, in which,
on the part of Father Nihill and of Mrs. Whalen, successive
requests were made upon the defendant board for the sur-
render of the child, to be placed, as aforesaid, in the St.
Francis Orphan Asylum ; to know the whereabouts of the
child ; to appoint certain reasonable dates upon which the
plaintiff, Father Nihill in her behalf, or her duly authorized

agent, might have permission and opportunity to visit the child, and that she be caused "to be permitted and allowed to practice and exercise, and directed to practice and exercise, the teachings, discipline and observances of the Catholic church;" that the Catholic pastor of the parish in which the child resides be permitted to visit her at reasonable times each Sunday, and at other times to be designated by the board, to administer spiritual consolation and instruction, and that the child be placed in the private family home of Father Nihill. On the part of the defendants these requests were met by stating the whereabouts of the child and by the promise "to appoint reasonable times at which Mrs. Whalen may visit her daughter, of which we will give Mrs. Whalen notice." To the other requests they declined to accede. The court below further found that the board has never in fact appointed times at which Mrs. Whalen might visit her daughter, and given her notice thereof as promised, but that such failure has been through no intentional disregard; that the board has at all times since said promise been ready at any reasonable time to bring the child to Bridgeport, and to give the mother full opportunity to visit it at their office, and offered at the time of the hearing to fix such times for the future if desired. It is also found that Father Nihill, "a person of good repute and of ample means and responsibility, is ready either to afford assistance to Mrs. Whalen to enable her (if not herself able) to support and care for the child in her own home, to take the child into his own home, (his household consisting of a female relative, who is his housekeeper, and himself,) or to place her in the St. Francis Orphan Asylum in New Haven, and in either place to provide for and insure a suitable support and education for the child."

On these facts the plaintiff contends that the object and intent of the statutes relating to "Homes for Dependent and Neglected Children," (Gen. Statutes, ch. 228,) is to retain children in custody only until the necessity for their protection has ceased to exist; that such statutes are in derogation of the common law and right and must be construed

strictly; that there is no discretion on the part of the board of management to do otherwise than to discharge children from custody when the necessity for protection has ceased; that such discretion as is permitted to them is simply ministerial or executive, pertaining solely to management and discipline; and that "restraint of personal liberty resulting from the palpable abuse of an executive or even judicial discretion, may be remedied by writ of habeas corpus;" citing among other authorities *McCready* v. *Wilcox*, 33 Conn. R., 321. It is indeed true, as the plaintiff further says, that the homes provided by the statute are not penal or reformatory institutions, and are not intended for the detention of children for the purposes of punishment or moral reformation. Such homes are provided in the exercise of a guardianship and protection assumed by the state as *parens patriæ*, taking to its bosom its infants, deserted, neglected, cruelly treated, or dependent, and giving to these homeless ones a home.

Under the conditions contemplated by the statute it would be absurd to deny that the right of the parent to the control, custody, maintenance and education of his or her minor children, must yield to the state, and that the welfare and best interests of the child, in questions relating to custody, is paramount to all other considerations. This the plaintiff concedes, but insists that the record discloses that the best interests of the child would be at least as well subserved by the transfer of custody to her, and that the parent who can suitably provide for and educate his child is by law entitled to resume its control. Let us look at the statute. It is said that a marked feature is the frequent repetition of the word "temporary" in its provisions. But the use of this word is never such as to indicate that the control by the board of management is intended to be temporary. On the contrary, it is solely employed in reference to the "place of refuge," which "shall not be used as a permanent provision or residence for any child, but for its temporary protection, for so long a time only as shall be absolutely necessary for the placing of the child in a well selected family home," (§ 3655);

and the distinction between such temporary homes, which might indeed under certain circumstances be established in desirable private families ( § 3656,) and "family homes," which are never referred to as "temporary," is always strictly preserved. Again, the commitment of children is not by the board, but to it, that is, to the temporary homes, by competent authority, (§ 3653,) the commitment being "until such child shall be sixteen years of age, unless sooner discharged by said board of management of temporary homes." True, this provision, also that in section 3655, "that children so committed may be withdrawn upon the authority of said board," indicates that the boards are empowered to discharge, but that they are bound to do so under any circumstances whatever, before the child arrives at sixteen years of age, is a claim which receives no warrant from any expression or implication of the statute. It would seem that the existence of such an obligation might tend to seriously embarrass the board of management in the discharge of its duty, and prevent, in some degree, its most beneficial exercise for the welfare of the wards which the state commits to its keeping. The better the character of the well-selected family home, the more essentially in spirit and truth it is such, the more likely they who compose it would be to require assurance of a degree of perpetuity to the relations about to be assumed. She who would become a nursing mother of a deserted, neglected, cruelly treated or dependent child, might wish to feel, and demand to know, that even a natural parent could not have, during the time in which the state assumed to hold the guardianship of the child, a right superior to her own.

In the case before us the child was committed at the mother's request. She was placed in a home where she has always been most kindly and well cared for.

The mother, through the benefactions of her pastor, is now able to provide for and ensure a suitable support and education for the child. This, in our judgment, is not sufficient to enable us to hold that such child is unlawfully restrained by the board of management and is entitled to be

discharged. We can discover no "palpable abuse of discretion." Nor can we see that the board, while having sole regard for the best interests of the child, has yet erred in judgment. Had there been such error of judgment, or even abuse of discretionary power, we do not decide whether the writ of *habeas corpus* would have been a proper remedy.

We ought not to occupy more space with this part of the case, and will therefore only add that many additional and most pertinent considerations may be found in the opinion of the court in the case of *Dumain & Wife* v. *Gwynne*, 10 Allen, 270.

The plaintiff, however, further and most earnestly contends that Josie Barry should be permitted to receive and exercise the teachings and practices of the Catholic church, in which she was christened, and in accordance with the faith of her parents and the request of the only surviving one ; and that it was unlawful for the defendants to refuse the requests of the parent in that regard. In another aspect, and in reply to the claim of the defendants that they have in no wise interfered with the religious training of the child, but that they could not imperil her prospects of remaining in the best home which could be procured for her by imposing conditions which might result in her being deprived of such home to her detriment, the plaintiff insists that a home is not suitable or well selected, within the intent of the statute, in which a child of tender years cannot be instructed according to the faith of its parents.

This contention presents for our determination questions of the most delicate character. On the one hand all humane principles require the utmost possible consideration to be paid to those natural affections which exist between parent and child, and it should ever be an object of the law to promote and foster such affections. Under this statute also the state assumes only a brief guardianship, not to begin until the child is two years old, (in this case it did not in fact begin until she was eight,) and to certainly terminate at sixteen, and it is entirely conceivable that in many instances the sundering of religious teachings and sentiments, dur-

ing such a period, might result in lasting regret and injury both to parent and child. As the plaintiff forcibly says, " the object of the statute is a humane one ; its operation should be carefully scrutinized, that no part of its working may inflict a wound upon those whose misfortunes it assumes to relieve." For illustration we will say that the circumstances must be exceptional that would justify the board in concealing from the parents the residence of the child, or in interfering with, or failing to provide proper opportunities for, their intercourse with it at suitable times. It is true that their character or conduct might be such as to require such interference, but it should be very carefully exercised, having just and tender regard to these family ties which are a common heritage.

But, on the other hand, the rule for which the plaintiff contends, which is, and necessarily must be in effect to warrant the result claimed, that where the natural and common law right of the parent to the control, custody, maintenance and education of his minor child is for any cause surrendered, abridged or forfeited to the state as *parens patriæ*, although the state for all other purposes stands *in loco parentis*, yet it is the right of the parent—the father, if living, if not the mother—to prescribe for the child, until it arrives at the age of understanding and voluntary choice, any form of lawful worship such parent deems desirable and conducive to the best interests of the child, would lead to consequences in no wise limited and confined in operation to the construction and application of the statute under consideration, but of far reaching import and most serious results.

We are aware of no authority in any jurisdiction which, properly considered, tends in the least degree to support the plaintiff's claim, and further are convinced that the existence and exercise of such a rule would be opposed to public policy and the best interests of the state. In our judgment, the only limitations upon the power of the state, acting through its constituted agents, in the nurture, education and religious training of its wards, is that imposed by the provisions of the constitution, which provide that " no preference shall be

given by law to any Christain sect, or mode of worship;" and "that the exercise and enjoyment of religious profession and worship, without discrimination, shall forever be free to all persons in the state."

We will not deny that it seems to us to be regretted that the board of management, in the exercise of a sound discretion, did not feel warranted in a greater degree in acceding to the plaintiff's requests, either by permitting her resumption of parental obligations and control, or by in some way procuring for and securing to her means of imparting to her child religious instruction in the faith in which the child was christened, which its parents professed and which seems so dear to the mother's heart. But viewed in the aspect of the legal principles involved, it is our clear opinion, and the Superior Court is advised, that the complaint should be dismissed and the said Josie Barry remanded.

In this opinion the other judges concurred.