Colin R. CORDOVA, a minor, 14 years of age, by and through Carlos Cordova, his father and next friend, 711 Findlay Street, Perrysburg, Ohio, Plaintiff,

v.

Edward W. CHONKO, as Principal of Perrysburg High School,

and

Robert M. Pierson, as Superintendent of Perrysburg Public Schools,

and

James M. Fraser, as President of the Perrysburg Exempted Village Board of Education,

and

John Landwehr, as a member of the Perrysburg Exempted Village Board of Education,

and

David H. Wilson, Jr., as a member of the Perrysburg Exempted Village Board of Education,

and

Richard Brittan, as a member of the Perrysburg Exempted Village Board of Education,

and

George J. Williams, as a member of the Perrysburg Exempted Village Board of Education, Defendants.

Civ. No. C 69–293.

United States District Court, N. D. Ohio, W. D.

July 30, 1970.

Harland M. Britz, Toledo, Ohio, for plaintiff.

Donald DeCessna, Perrysburg, Ohio, for defendants.

## OPINION

DON J. YOUNG, District Judge.

This is another "long hair" case. The plaintiff is a fourteen year old boy. The defendant school authorities and the boy's parents appear from the evidence to be functioning at about the same level of maturity. This simplifies the application of the old maxim "All parties stand equal before the law."

Although the facts in the case are relatively simple, the legal problems are of great difficulty and complexity. The principal problems are those which are always involved in the making and enforcement of sumptuary laws, and the role of the state in the life of a child. Linking the two is the involved question of the delegation of legislative authority.

Ostensibly, the Court's jurisdiction is involved under the provisions of 42 U.S. C. § 1983 and 28 U.S.C. § 1343(3) and (4). It is claimed that the defendants have acted and threatened under color of state law to deprive the plaintiff of rights, privileges and immunities secured to him by the Constitution of the United States.

Although the evidence was not without conflicts, most of these lie in areas of opinion, rather than in matters of objective facts. All of the opinion evidence offered is so tainted with subjective biases, conflict with the physical facts, limited skill and experience, and inaccurate or inadequate observation and sampling as to have little or no probative value.

The preponderance of the evidence shows that the plaintiff is a native of Perrysburg, Ohio, a suburb of the City of Toledo, as are his mother and his brother and sisters. Perrysburg has a population of about ten thousand, encompassing a wide variety of socioeconomic classes, ranging from poverty to great wealth. The Perrysburg Exempted Village School District has a pupil population of about twenty-six hundred fifty, of which about eight hundred attend Perrysburg High School.

The plaintiff was about to enter high school in September of 1969. A trombone player, he aspired to membership in the school band. Consequently, about the middle of August he reported, with other entering freshmen, to band practice.

During the preceding summer, plaintiff had let his hair grow. When he reported for band practice, the band director took exception to the length of his

hair. She first requested, and then ordered, that he cut it. Upon his declining to do so, the matter was brought to the attention of the defendant Chonko, the high school principal, who ordered plaintiff to cut his hair. Plaintiff again declined, whereupon he was suspended by Chonko from further band activities for ten days. He, his parents, and other school officials, were given written notice of this suspension (P. Ex. 1), in accordance with state law.

With respect to the band, the evidence showed that the band members were both boys and girls. The evidence conflicted as to the proportions, ranging from 60/40 to 34/66 girls. Whatever the proportion, it was clear that all band members, regardless of sex, wore identical uniforms, consisting of trousers, jackets, and plumed garrison caps. Obviously, therefore, a boy with long hair would appear no different from a girl, so that the plaintiff's hair length could not possibly have interfered with that uniformity of appearance which defense witnesses testified was absolutely essential to prevent the entire band from being humiliated and ridiculed. Although there was evidence tending to indicate that long hair blowing about in the autumn breezes could cause problems in marching by obstructing the wearer's vision, this same evidence demonstrated that the distaff members of the band were able to cope with these problems by the use of such devices as hairpins and rubber bands, which the band director always had available. There was no evidence whatsoever that plaintiff's long hair had caused any such problems. The band director complained that audiences were distracted from proper observation of and attention to the band's performance by their efforts to distinguish the plaintiff from his female colleagues. The Court takes the liberty of doubting both the accuracy and the importance of this observation. In any event, it could not have posed a problem at any time before the plaintiff's suspension and the commencement of this action, as the band had given no public performances up to that point.

On September 3rd, 1969, school opened. The plaintiff, suspecting that he had not heard the last of the matter of his coiffure, had armed himself with a letter from his attorney directed to the defendant Chonko (P. Ex. 6) warning him that any further efforts on the part of the school authorities to change the plaintiff's hair style would result in litigation.

On the opening day of school, the defendant Chonko called plaintiff to his office and ordered him to get a haircut. Plaintiff presented the attorney's letter, which was ignored. After some period of bickering and correspondence, on September 26th, the defendant Chonko, by a letter dated September 26, 1969 (P. Ex. 3), suspended the plaintiff from school. This suspension was not in conformity to the Ohio statutes, which give school principals authority to suspend only for a fixed period not to exceed ten days. § 3313.66 O.R.C. The letter ordered suspension until the plaintiff cut his hair to a reasonable length, and was thus clearly in excess of the defendant Chonko's authority.

At the same time that plaintiff was suspended, another pupil was also suspended on the same terms and for the same reason. The evidence did not disclose what happened to him. Presumably he rode back into school on the plaintiff's coattails.

Promptly after receiving notice of suspension, the plaintiff commenced this action. A motion for a preliminary injunction was heard and granted, and the defendants were enjoined from excluding the plaintiff from the school or its activities pending final hearing.

The evidence disclosed considerable dispute about the actual length of plaintiff's hair at the time of the actions complained of. At the time of trial, plaintiff's hair was what can best be described as a "page-boy bob," to use the language of another era, somewhat

shorter than shoulder length. Various of defendants' witnesses testified that in August and September of 1969, it was at least as long, if not longer, than at the time of trial. Photographs taken on August 19, 1969, the day after plaintiff's first suspension, introduced in evidence as plaintiff's exhibits 7 and 8, and as exhibit A attached to the complaint, show his hair considerably shorter than it appeared in the courtroom, when the ends curled outward. Plaintiff's exhibits 9 and 11, taken by the school sometime in the fall of the year, also show the hair shorter than at the time of trial, although in those it also curls outward.

Various teachers and students offered testimony to the effect that plaintiff was a well-behaved and courteous student; that he caused no disturbance of any kind in his classes, nor did he ever comb or fuss with his hair in class; that they had heard other students make remarks about plaintiff's hair, but that when plaintiff heard such remarks, he ignored them; that on two occasions teachers had mistaken plaintiff for a girl wearing slacks, which was forbidden, but neither did anything about it, although one was embarrassed; that after the plaintiff returned to school under this Court's order, other male students were emboldened to emulate him and wear their hair longer; that one boy who did so got into an altercation about it with some fellow students, who threatened forcibly to cut his hair; and that this resulted in a complaint from his mother to the defendant Chonko, who was thus forced to reprimand the boys who made the threat. One student who testified, and who at the trial was wearing hair nearly as long as plaintiff's, although not so full, and a handsome set of sideburns which extended almost to his chin, and well below the corners of his mouth, stated that he and some fellow-students had once discussed forcibly cutting plaintiff's hair, but concluded that they would get in trouble if they attempted to do so, and so did nothing.

The plaintiff himself testified that he wore his hair the way he did simply because he liked it that way; that he had suffered some joshing by his fellow students, but ignored it. It might be observed that to some extent the plaintiff did more than ignore the teasing. To borrow a psychological term, he "suppressed" it, since he had no recollection of one incident where the boys in the toilet told him the girl's toilet was down the hall. Plaintiff denied that the incident happened, although testimony of one of the other students involved established that the incident did in fact happen. Case law indicates that this episode is standard with high school students protesting non-conformity of hair style.

Although the evidence has been recited in great detail, there was much more evidence on the part of the defendants that after the plaintiff's return to school under the Court order, there was a general relaxing of discipline and a more defiant attitude on the part of the student body to the school's authority; that the faculty were divided over the issue, and some of them were unhappy about the change in student attitude toward discipline; that it would be difficult to recruit teachers in the face of this dissent and disaffection; that voters who were inimical to long-haired students would defeat bond issues and tax levies; that tardiness and truancy were increasing and would continue to do so; that it was implied that the ultimate total collapse of the school system was only a matter of a short time off. As previously stated, the evidence concerning these dire consequences of plaintiff's action is totally lacking in probative value.

It is abundantly clear from the evidence that the plaintiff's long hair did not actually cause any sort of physical disturbances in the school prior to the time of his suspensions. If there were any disturbances after that, they were in no way direct unruly acts of the plaintiff, but resulted from the emotional response stirred in various individuals by this Court's order that the plaintiff be allowed to remain in school.

The defendants justify the act of suspending plaintiff on the basis that his hair style was contrary to the lawfully promulgated rules of the school district, which are valid, clear, and non-discriminatory. This contention necessitates an examination of the facts in this area.

The evidence shows that the defendant Board of Education at some time prior to the arising of this action had adopted a set of rules and regulations, a portion of which was introduced in evidence. D. Ex. 1. These rules and regulations contain no specific provisions concerning dress or hair styles of pupils or teachers. On pages 17 to 19 of D. Ex. 1 are rules applicable to pupils. Rules 3 and 7 on page 17, and rules 11 and 12, on page 18, are the only ones germane to this controversy. They read as follows:

"3. They shall avoid whatever is contrary to good deportment both at school and on the way to and from school. They shall be polite and respectful at all times and shall render implicit obedience to their teachers and their principal. They shall be diligent in study and prompt in recitation in the classroom.

"7. They shall on entering school be properly clad and clean in person in accordance with the rules and regulations established by the building principal. Any pupil failing in this respect may be sent home by the Principal to be properly prepared for the school room.

"11. They shall be held subject to suspension by the Principal or the Superintendent of Schools for any of the following causes: continuous neglect in regard to person and dress, immorality, continued disobedience to the principal or teacher, willful or gross misconduct, the use of tobacco in any form on the school grounds, absence or tardiness without presentation of a satisfactory statement as to the reasons therefor.

"12. Any pupil suspended from school can be readmitted only on such conditions as the Superintendent and his staff may determine."

The evidence showed that during the 1966–67 school year, the first year that the defendant Chonko was the principal at Perrysburg High School, the Student Council undertook to revise the so-called "school handbook." The work was done by a committee of five, and afterwards approved by a vote of the whole Council, which had twenty-one members. The result was offered in evidence as D. Ex. 2. At the top of page 10 of this exhibit appears the only rule with regard to dress, which reads as follows:

"STUDENT DRESS

Perrysburg High School Students are expected to be well groomed and dressed in good taste, at all times.

Such things as extreme hair styles or hair cuts, sloppy or unclean clothes are not considered to be in good taste and therefore should not be worn."

The evidence as to the development of this language was that the student committee originally produced a rule which was too wordy and too exact. This was rewritten to get the wording used.

Thereafter, the sections on dress in the student handbook were redrafted by the defendant Chonko, so that for the 1969–70 school year, in question here, the 1968–69 handbook, D. Ex. 5, which was the book in use, contains the following language, on page 11:

"PROPER STUDENT DRESS

To dress properly is as important as the selection of a good book. Just as Perrysburg High School strives to set high standards in the class room, so it attempts to give careful attention to the many details aside from the academic that contributes [sic] so much to the mark of an educated person. There is strong tendency today to dress so informally as to be actually slovenly. Therefore, it is expected of Perrysburg High School Students to

be well groomed and dressed in good taste at all times.

### "GUIDE LINES FOR DRESS

Casual clothing such as pant dresses for girls and work jeans for boys are considered inappropriate dress and should not be worn. Neat, trim, and proper [sic] fitting dresses and skirts, with length just above the knees, are considered appropriate for girls in school. Neat slacks, sport shirts, colored jerseys and sweaters are appropriate wear for boys in school.

Such things as extreme hair styles or haircuts are not considered in good taste. Boys [sic] haircuts are to be conventional."

On pages 16 and 17 of D. Ex. 5 appears the school "Code of Discipline". Under the heading "Class Suspension" on page 17 appears the only rule regarding dress, as follows:

"3. Clothing

Students attending Perrysburg High School will not be admitted to classes unless properly attired. The personal appearance and conduct of all pupils shall be of such character as not to disrupt or distract from the instructional procedure of the school or tend to diminish the disciplinary control of the teacher.

The defendant Chonko testified that at an orientation session for all junior high school students planning to enter high school, the dress regulations were read to the students, including plaintiff, and he then defined to them the words "haircuts are to be conventional" as "hair style as you see it on me and others in the school." When the difficulties with plaintiff arose, he specifically defined the term to him as "above the eyes, above the ears, above the collar, and tapered in the back". The defendants offered expert testimony from various barbers that those specifics did indeed define a conventional haircut, and would be applied in the highly improbable event someone came to them and asked for a "conventional" haircut. This Court has

considerable reservations about this "expert" testimony. It is entitled to little or no weight.

It was admitted that the defendant Board of Education had never itself adopted any specific regulations as to dress or hair style, or adopted any resolution ratifying or approving the student handbooks, or any part thereof.

All of this evidence may be summarized by saying that while plaintiff's hair style may be considered not to conform to the pronouncements of the school handbook, the school handbook may be considered at the most as a rule promulgated by a building principal. There was no evidence that plaintiff's lack of conformity to this rule, up to the time of the commencement of this action, or thereafter, disrupted or distracted from the instructional procedure of the school, or tended to diminish the disciplinary control of the teacher.

In this posture of the evidence, it becomes necessary to examine the law applicable to the facts found.

As pointed out at the outset of this opinion, the case involves the very difficult problem of the drafting and applying sumptuary laws within the framework of the constitutional liberties of the subject. The problems presented in this area are most conspicuous in the area dealing wih pornography. No citation of authority is required to illustrate the confusion and controversy existing there.

A considerable body of case law has developed in the courts, both state and federal, with respect to the specific problem of hair styles in schools.

The most recent pronouncement of the Court of Appeals of this Circuit is Jackson, et al. v. Dorrier, et al., 424 F.2d 213 (6 Cir., 1970). It is clear that the present case does not come within the facts of that case. Specifically, the plaintiffs there deliberately caused disruption of class and other school activities by their hair styles and actions; they were otherwise disciplinary problems and were failing scholastically as the result of activities directly related to their hair

style; and their hair styles far more extreme than that of the plaintiff herein, were deliberately cultivated for their commercial advantage. Hence this Court cannot dispose of the issues herein by the simple device of applying the Jackson v. Dorrier ruling to this case.

It is impossible to find any uniformity of reasoning, ruling, or result in the decisions of other courts that have considered the problem of long hair in school. In Richards v. Thurston, 424 F.2d 1281 (1st Cir. 1970), the Court, in footnote 3 on page 1282, has collected and grouped the cases, listing eight against the students and eight for the students, with an analysis of the reasoning in the latter cases. The Jackson v. Dorrier case is not included in the anti-student listing, so it offsets the pro-student ruling in *Richards,* leaving the authorities still evenly divided.

All of these various cases, with their different results and reasons, seem to be concerned with the same difficulties that possess the pornography cases, the extent to which the constitutional liberty of self-expression may be restricted by authorities whose tastes or ideas differ from those of the person claiming his freedom. In the ages old conflict between the right of the individual to be himself, to be let alone, and the right of society to have reasonable peace and order, the stakes are too high to permit any simple or easy resolution of the dispute.

What seems to be overlooked in the cases involving the hair styles of school children, such as the present case, is that in spite of such recent broad statements as "[N]either the Fourteenth Amendment nor the Bill of Rights is for adults alone." In re Gault, 387 U.S. 1, 13, 87 S.Ct. 1428, 1436, 18 L.Ed.2d 527 (1967), children cannot be accorded all the liberties constitutionally afforded to adults without encountering very serious practical difficulties. See, for example, those illustrated by the late Judge Paul Alexander in "The Fable of the Fantastic Delinquents", FEDERAL PROBATION, March 1960, P. 16. "[T]he simple, suc-

cinct phrases of the Bill of Rights, indestructible protections to some of the fundamentals of our way of life, can be, and often are, expanded by rhetorical inflation beyond all semblance to the realities with which they were meant to deal". Worthy v. Herter, 106 U.S.App. D.C. 153, 270 F.2d 905, 907 and 908 (1959). In spite of the broad language referred to, in *Gault* the Supreme Court is careful to point out that "We do not in this opinion consider the impact of those constitutional provisions upon the totality of the relationship of the juvenile and the state." 387 U.S. 13, 87 S.Ct. 1436. Although the Supreme Court repeats this language in Ginsberg v. New York, 390 U.S. 629, 638, 88 S.Ct. 1274, 20 L.Ed.2d 195 (1968), it goes on to say "[W]e have recognized that even where there is an invasion of protected freedoms, 'the power of the state to control the conduct of children reaches beyond the scope of its authority over adults * * *.' Prince v. Massachusetts, 321 U.S. 158, 170, 64 S.Ct. 438, 88 L.Ed. 645." Mr. Justice Stewart, concurring in result in *Ginsberg,* says (390 U.S. p. 649, 650, 88 S.Ct. p. 1285):

> "I think a State may permissibly determine that, at least in some precisely delineated areas, a child—like someone in a captive audience—is not possessed of that full capacity for individual choice which is the presupposition of First Amendment guarantees. It is only upon such a premise, I should suppose, that a State may deprive children of other rights—the right to marry, for example, or the right to vote—deprivations that would be constitutionally intolerable for adults."

He repeats this statement in his concurring opinion in Tinker v. Des Moines School District, 393 U.S. 503, 514 and 515, 89 S.Ct. 733, 741, 21 L.Ed.2d 731 (1969), adding,

> "I cannot share the Court's uncritical assumption that, school discipline aside, the First Amendment right of children are co-extensive with those of adults. Indeed, I thought the Court decided otherwise just last term, in

Ginsberg v. New York, 390 U.S. 629, 88 S.Ct. 1274."

In order to reach a proper resolution of the problem presented by the case before this Court, it is necessary to make more than a narrowly limited examination of the relationship between the child and the state. This is a relationship that it is much easier from a legal standpoint to stay away from than to explore, for as was pointed out some seventy-nine years ago,

"[T]he question goes to the very depths of the subject of civil government, and may grow more difficult as the necessity of saving the young from evil lives becomes more pressing or apparent." RICH, State Guardianship of Children, 15 L.R.A. 593 (1891).

On the sixth of July last, the Honorable David Bazelon, Chief Judge of the Circuit Court of Appeals for the District of Columbia Circuit, pointed out in a speech to the National Council of Juvenile Court Judges that the only practical and workable solution to the problems of juvenile delinquency and youth crime lay in the public schools, which have the greatest contact with and control over all children. He recognized that as a practical matter the state, through the school, does actually have the most potent relationship to children that there is, either for good or for evil. He also stated that the schools, as presently administered, were demonstrably incompetent to perform this task. This fact is rather obvious from the spate of such cases as this one.

It is obvious that the problem presented by the facts of this case cannot be solved by reference to cases concerned with the constitutional rights and liberties of adults. Children of necessity cannot be uncritically accorded these rights, and it is foolish to say that they can be.

Many years ago, the writer of this opinion said,

"Some * * * seem to forget what the wise parent knows, for example, that children really are not adults.

They do not come to life fully equipped with knowledge and wisdom, like Minerva springing full-panoplied from the brow of Jove. They are not like insects which are hatched complete with all the instincts they need to complete their life cycle. On the contrary, human children start life completely helpless, and must come to the rights and privileges of adulthood by slow degrees. In that process, restraints to which adults are not subject are absolutely essential. I defy anyone to look back at his own childhood without finding at least one occasion when he felt his liberty had been severely restricted. Yet, as adults we impose the same restrictions on our own children because maturity has shown us the reasons and necessities for restraint." Journal of the American Judicature Society, October, 1960, Vol. 44, P. 97. Children's cases simply cannot be correctly decided by reference to decisions dealing with adults.

"Children have a very special place in life which law should reflect. Legal theories and their phrasing in other cases readily lead to fallacious reasoning if uncritically transferred to determination of a State's duty toward children." Frankfurter, J., concurring, in May v. Anderson, 345 U.S. 528, 536, 73 S.Ct. 840, 844, 97 L.Ed. 1221 (1952).

It is abundantly clear from the development of the law over a period of the last two centuries or more that the relationship of the state to children is a parental one. As specifically applied to the problem here presented, this has many times been expressed by saying that the state stands in *loco parentis* to children in school. Thus a child has no more right to defy the school than he does to defy his own parents, and to do some act not permitted merely because he likes to. In the present case, the only reason assigned by the plaintiff for his desire to wear his hair as he does is that he likes it that way. His hair style is thus no expression of an opinion, but is the mere whim of a child to which his

indulgent parents cater. The role of the state, however, is that of the wise parent, not the foolish or indulgent one.

"It is to be remembered that the public has a paramount interest in the virtue and knowledge of its members, and that of strict right, the business of education belongs to it. That parents are ordinarily entrusted with it is because it can seldom be put into better hands; but where they are incompetent or corrupt, what is there to prevent the public from withdrawing their faculties, held, as they obviously are, at its sufferance. The right of parental control is a natural, but not an inalienable one." Ex Parte Crouse, 4 Whart. 9 (1839).

Thus, should there be a conflict between the rules promulgated by the state, through its schools, and those established by the parents, it is clear that those of the school must prevail, regardless of the fact that the child spends more time with the parent than with the state.

To say that this practical legal conclusion is a deprivation of liberty is neither good sense nor good law.

"For the maintenance and preservation of liberty, individual rights must be restricted for various reasons from time to time * * *. Liberty itself is inherently a restricted thing. Liberty is a product of order. There is no liberty in anarchy or in chaos. Liberty is achieved by rules, which correlate every man's actions to every other man's rights and thus, by mutual restrictions one upon the other, achieve a result of relative freedom. The mere day-to-day maintenance of the order which insures liberty requires restrictions upon individual rights. Some actions, neither harmful nor potentially dangerous, must be restricted simply for the sake of good order in the community. * * *" Worthy v. Herter, *supra*, 270 F.2d at 908.

"Civil liberties, as guaranteed by the Constitution, imply the existence of an organized society maintaining public order without which liberty itself would be lost in the excesses of unrestrained abuses." Cox v. New Hampshire, 312 U.S. 569, 574, 61 S.Ct. 762, 765, 85 L.Ed. 1049.

Thus, in that smaller community which is the school, it may well be that some actions which would be tolerable in the larger community, and are neither harmful nor potentially dangerous, must be restricted for the sake of good order.

Nevertheless, there is a caveat which the state, even when functioning *in loco parentis* through its school system, must observe:

"But the admonition to function in a 'parental' relationship is not an invitation to procedural arbitrariness." Kent v. United States, 383 U.S. 541, 555, 86 S.Ct. 1045, 1054, 16 L.Ed.2d 84 (1966).

■ It is here that we encounter a key problem, which seems to be brushed aside or not considered in the now numerous cases dealing with school pupils' hair styles. It is not to be disputed that such a rule or regulation is, to a greater or lesser extent, arbitrary. To the extent that such a rule is promulgated merely because some school principal or superintendent is fearful that it may cause some dispute or controversy, it cannot stand.

"But, in our system, undifferentiated fear or apprehension of disturbance is not enough to overcome the right to freedom of expression. Any departure from absolute representation may cause trouble. Any variation from the majority's opinion may cause fear. Any word spoken, in class, in the lunchroom, or on the campus, that deviates from the views of another person may start an argument or cause a disturbance. But our Constitution says we must take this risk, Terminiello v. Chicago, 337 U.S. 1, 69 S.Ct. 894, 93 L.Ed. 1131 (1949); and our history says it is this sort of hazardous freedom—this kind of openness—that is the basis of our national strength and of the independence and

vigor of Americans who grow up and live in this relatively permissive, often disputatious, society." Tinker v. Des Moines School District, 393 U.S. 503, 508 and 509, 89 S.Ct. 733, 737 (1969).

It is clear from an examination of many of the "long hair" cases that the violated rule is the arbitrary fiat of a single administration official, principal or superintendent, as the evidence clearly shows it was here. When the matter comes before the public body entrusted with the rule-making function, the Board of Education, it is resolved there, not by a proper consideration of the reason for, necessity of, or propriety of the rule itself, but on a basis of the administrative necessity of upholding the already taken action of a subordinate. Whether the subordinate's action violates the Supreme Court's caveat against procedural arbitrariness is given no consideration.

In this case, fortunately, we do not find ourselves in that position, for the plaintiff by-passed any administrative proceedings before the defendant Board of Education, as he was legally entitled to. McNeese v. Board of Education for Community Unit School District 187, 373 U.S. 668, 83 S.Ct. 1433, 10 L.Ed.2d 622 (1963), Monroe v. Pape, 365 U.S. 167, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961). It is clear from the evidence in the case that the rule under which plaintiff was twice suspended has never been considered or acted upon officially by the defendant Board of Education.

The Ohio Statute, § 3313.20 O.R.C. provides in part that:

"The Board of Education shall make such rules and regulations as are necessary for its government and the government of its employees, pupils of its schools, and all other persons entering upon its school grounds or premises. * * *"

Pursuant to this statutory authority, the defendant Board of Education adopted rule 7 set forth above, which will be repeated here for emphasis.

"7. They shall on entering school be properly clad and clean in person in accordance with the rules and regulations established by the building principal. Any pupil failing in this respect may be sent home by the Principal to be properly prepared for the school room."

Assuming, without deciding, that the Board of Education might properly delegate to an administrative employee the power to make rules and regulations to the extent permitted by the rule, it is clear that the rules and regulations so established must be limited to those subjects specified in the Board's rule 7, that is dress (they shall * * * be properly clad) and personal cleanliness (they shall * * * be * * * clean in person). The distinction between rules covering these subjects and rules covering hair styles is clear.

"[A] school rule which forbids skirts shorter than a certain length while on school grounds would require less justification than one requiring hair to be cut, which affects the student twenty-four hours a day, seven days a week, nine months a year." Richards v. Thurston, *supra*, 424 F.2d p. 1285.

It should be pointed out further that the rule of the Board of Education delegating to the building principal authority to make dress regulations does not authorize him to fix penalties for violation, for it carries with it the penalty, that the "pupil * * * may be sent home by the Principal to be properly prepared for the school room." This is both a reasonable and practical penalty for being improperly dressed or unclean, since the pupil may easily and quickly change clothes or be bathed. It is not so for requiring a haircut.

The Court is thus irresistibly impelled to the conclusion that, there being no valid rule of the defendant Board of Education with respect to hair styles of pupils in its school, the defendant Chonko

was acting beyond his powers in establishing such a rule, and in attempting to enforce it by the drastic penalty of suspending the plaintiff from school.

■■ As previously pointed out, the general rule is that children do not actually possess all of the liberties of the person accorded to adults by the Bill of Rights. Hence, as to the claim of First Amendment rights of free expression and Fourth Amendment right of privacy, it cannot be found that the defendant Chonko, in suspending the plaintiff, or the defendant Board of Education, its members and its Superintendent, in failing to correct or restrain Chonko from exceeding the powers granted to him, are chargeable with a violation of the Civil Rights Act.

■■ This is not to say, however, that children have no rights whatever. In certain limited areas, particularly those dealing with the Fifth and Sixth Amendment rights, as pointed out in In re Gault, *supra*, and In re Winship, 397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970), constitutional guarantees are directly applicable. Moreover, beyond those areas, a child does have the right to due process and fair treatment.

> "The constitutional safeguards vouchsafed a juvenile * * * are determined from the requirements of due process and fair treatment, and not by the direct application of the clauses of the Constitution which in terms apply to criminal cases." Pee v. United States, 107 U.S.App.D.C. 47, 274 F.2d 556, 559 (1959).

This language was quoted with approval by the Supreme Court in Kent v. United States, 383 U.S. 541, 562, 86 S.Ct. 1045 (1966) that is later repeated in In re Gault, 387 U.S. 1, 30, 87 S.Ct. 1428, 18 L.Ed.2d 527 (1967). The late Judge Paul Alexander summarized this concept of due process and fair treatment in the words,

> "Injustice to a child should be unforgiveable, unthinkable." 46 A.B.A.J. 1210 (1960).

Due process and fair treatment imply, at least, that the actions of public officials shall be reasonable.

■ Applying this law to the present *factual situation, it is clear that the ac*tions and inactions of the defendants in suspending or permitting the suspension, of the plaintiff from the public school because he did not wear the same hair style as the principal, were, viewed in their totality, unreasonable and deprive him, under color of state law, of his constitutional rights to due process and fair treatment. It was, under all of the circumstances, unjust. The plaintiff is therefore entitled to an order of injunction restraining the defendants from interfering with his attendance at school so long as the rules and regulations remain as they were at the time of the commencement of this action, and at the time of trial.

This determination, of course, leaves to the Board of Education the power, if in the exercise of its legislative discretion it is essential to the good order and discipline of the school that some uniform hair style for students be established, to frame and enact such a rule. The members of the Board of Education are elected by the public of the school district, and may be replaced by the public if they establish rules which are disapproved by a majority of the electors. It may be hoped that somewhere along the road of these democratic processes sufficient good judgment will be exercised to make a distinction between those internal values which are important, and those external appearances which are not. In any event, the plaintiff, and all the other students in the school system, will have to abide by any rules in this regard which are ordained by the Board of Education itself.

The importance of maintaining discipline as part of the educational process in schools cannot be over-emphasized, but the element of an unreasonable arbitrariness in disciplinary matters is also important.

"The fact that the American system of government is controlled and directed by laws, not men, cannot be too often or too strongly impressed upon those who administer any part or branch of the government. Where a proper spirit and good judgment are followed as a guide, oppression can and will be avoided." Mill v. Brown, 31 Utah 473, 88 P. 609, 615, 120 Am.St.Rep. 935 (1907).

■ Whether a proper spirit and good judgment require that the students in Perrysburg High School must wear their hair cut short is a question to be determined by the Board of Education, after a proper study of the mores and wishes of the public, including the students and the faculty of its school, and not by this, or perhaps properly by any, court.

■ The plaintiff is also seeking in this action to be awarded damages for the violation of his civil rights. While this Court is satisfied that a child fourteen years of age has no right, constitutional or otherwise, to wear his hair the way he likes it merely because he likes it that way, nevertheless, as has been demonstrated, he does have rights which were violated by the actions and inactions of the defendants under color of state law. He is, therefore, entitled to an award of damages. There is no showing that the plaintiff has suffered any actual pecuniary loss or damage whatsoever. Indeed, it does not appear that he has even been annoyed or humiliated beyond what is usual in the course of a child's growth, and may, in fact, have been made a hero by some. The unpleasant facts of this case are such that this Court can find no reason to punish the defendants for their actions. What was done, although arbitrary and unfair, was the product of mistake, rather than evil intent to do wrong. Thus there can be no proper award of punitive damages either.

In this posture of the case, it is clear that plaintiff is entitled only to nominal damages for the violation of his rights, and judgment will be rendered in his favor in the traditional amount of one cent ($0.01).

This opinion will serve as the Court's findings of fact and conclusions of law. The plaintiff shall prepare and submit an order expressive thereof in accordance with the provisions of Rule 4 of the Rules of this Court.