480 P.2d 878

Chris MURPHY, an Infant, by John C. Murphy, his Guardian Ad Litem, Plaintiff-Appellant,

v.

POCATELLO SCHOOL DISTRICT #25, Rulon M. Ellis, Superintendent Pocatello School District #25; and Lionel Bowser, Principal Highland High School, Defendants-Respondents.

No. 10482.

Supreme Court of Idaho.

Feb. 10, 1971.

McDermott & McDermott, Pocatello, for plaintiff-appellant.

Merrill & Merrill, Pocatello, for defendants-respondents.

McFADDEN, Justice.

In March of 1969 Chris Murphy was called to the office of Mr. Evans, the vice-principal of Highland High School in Poca-

tello, and told to get his hair cut; Murphy refused and was suspended.

This action was instituted on behalf of Chris Murphy by John C. Murphy, his father and guardian ad litem, the plaintiff-appellant here. Appellant sought a writ of mandate to compel Pocatello School District No. 25, Rulon M. Ellis, superintendent of the school district, and Lionel Bowser, principal of Highland High School, the defendants-respondents, to reinstate Chris Murphy as a senior in the Highland High School following young Murphy's suspension from school for failure to comply with a rule of the school district concerning hair style.

Murphy filed this action on April 7, 1969, following his suspension from Highland High School on March 27, 1969. The trial court issued its order and alternative writ of mandate requiring the respondents to show cause on April 21, 1969, why they should not be enjoined and restrained during the pendency of the action from refusing young Murphy permission to return to school, and further issued a temporary restraining order against the respondents from refusing to allow Murphy to return as a regularly enrolled student. By his complaint, Murphy sought a permanent writ of mandate against the respondents, and also prayed for damages sustained by reason of the acts of the respondents in suspending him from attendance at school.

Respondents moved to dismiss the action, and also appeared before the court on the date required in the order to show cause. Testimony was adduced at that time on behalf of both the appellant and the respondents. Following the hearing on April 21, 1969, the trial court two days later issued a memorandum decision and order which denied the petition for writ of mandate, dismissed the petition and dissolved the restraining order. The respondents then filed a motion for summary judgment. The trial court in a memorandum decision recited

"upon stipulation of counsel that the Motion for Summary Judgment could be determined based upon the files, records, and evidence as heretofore presented to the Court * * *"

and then ordered that the motion for summary judgment be granted. Summary judgment for the respondents was entered on May 22, 1969. Appeal was taken from the order of April 28, 1969 dismissing the petition for writ of mandate, and from the summary judgment dated May 22, 1969.

The facts are substantially as follows. In 1956 the Board of Trustees of the school district adopted rules and regulations dealing with student dress, one of which, item "4.f Student Dress," provided:

"When in the judgment of the principal, the dress, hair style, or affected appearance of any student detracts from the academic atmosphere of the school community and is disruptive of good order and discipline, that student may be suspended from school until such condition is corrected."

In implementing this rule at Highland High School, Mr. Bowser, the principal, who had helped to draft the foregoing rule, established a rule of thumb test of hair style acceptability of "off the eyes, off the ears, and off the collar." The school authorities determined that young Murphy's hair style was in violation of the rule since his hair was over his collar.

Murphy attended Highland High School for approximately three years commencing with his sophomore year. Witnesses testified that his grades were average or better and his attendance and conduct satisfactory, except for the instances in prior years when he had allowed his hair to grow too long. In his junior year he had suffered a suspension for letting his hair grow too long and for some other undisclosed reason, but was reinstated after a day's suspension and after he had his hair cut.

Mr. Ellis, the superintendent of the Pocatello schools, testified that the reason for the rule relative to student dress and hair style was to maintain the proper academic and disciplinary atmosphere.

Mr. Bowser, the principal of Highland High School stated that the rule was necessary for control of a student body of over twelve hundred.

Mr. Evans, the vice-principal stated, in effect, that the line regarding student appearance must be drawn somewhere and that letting down in one area would lead to letting down in other areas as well. It was his opinion that the "long hair" rule was preventative. As support for this conclusion, Mr. Evans stated that informal dress at school dances results in more disciplinary problems than at formal events. At no point did Mr. Evans establish a correlation between long hair and disciplinary problems.

The record reflects that Murphy as a pupil was not unruly or disruptive and that his attendance and work at school were satisfactory, if not above average. Some of Murphy's fellow students, and one of his instructors testified that Murphy's hair style did not create any problem of disturbance in the various classes, and did not distract from the academic atmosphere. The school district's only testimony regarding an actual problem with a long-haired male student related to an incident involving a forcible haircutting by students of a fellow student on the school grounds about a year before Murphy was suspended. The facts surrounding the incident were not made clear at the hearing. Respondents point out that after this present action was commenced several "long-haired" students felt the necessity of asking the faculty for protection from certain other students. This action was deemed necessary even though the "long-haired" students were within the standards established by the school authorities. The question is thus raised as to who actually was to blame for these hair-related "disturbances."

Statutory provisions which are involved in this action are:

I.C. § 33–205. "Denial of school attendance.—The board of trustees may deny attendance at any of its schools, by suspension or expulsion, to any pupil who is an habitual truant, or who is incorrigible, or whose conduct, in the judgment of the board, is such as to be continuously disruptive of school discipline, or of the instructional effectiveness of the school. Any pupil having been suspended or expelled may be readmitted to the school by the board of trustees upon such reasonable conditions as may be prescribed by the board; but such readmission shall not prevent the board from again suspending or expelling such pupil for cause.

No pupil shall be expelled without the board of trustees having first given notice to the parent or guardian of the pupil, which notice shall state the time and place where such parent or guardian may appear and show cause why the pupil should not be expelled. Any pupil who is within the age of compulsory attendance, who is expelled as herein provided, shall come under the purview of the youth rehabilitation law, and an authorized representative of the board shall file a petition with the probate court of the county of the pupil's residence, in such form as the court may require under the provisions of section 16–1807."

I.C. § 33–506, which provides in pertinent part:

" * * * and the board [of trustees] shall have the following powers and duties:

1. To make by-laws, rules and regulations for its government and that of the district, consistent with the laws of the state of Idaho and the rules and regulations of the state board of education; * * *."

I.C. § 33–512, which provides in pertinent part:

"The board of trustees of each school district shall have the following powers and duties:

* * * * * *

6. To prescribe rules for the disciplining of unruly or insubordinate pupils; * * *."

In this particular action the authority of the board of trustees to adopt rules con-

cerning the standard hair style of the individual students of the district is being challenged. Under the framework of the school system as it exists in this state, the board of trustees of each district is charged with the responsibility of conducting and financing the schools within the confines of the district.

In general, appellant asserts that the requirement that he wear his hair in conformity with the requirement of the school officials is in violation of his constitutional rights. In particular, appellant asserts that his rights to procedural due process were denied under I.C. § 33–205. The record, however, reflects that Murphy, his father and Murphy's counsel were given sufficient notice and opportunity to be heard.

But the substantive constitutional issues appellant raises cannot be disposed of as easily. It must be noted that the traditional presumption of legislative validity does not apply to the substantive issues appellant raises under the First, Fifth, Ninth and Fourteenth Amendments. The United States Supreme Court has repeatedly required something more of legislation involving fundamental rights than merely some reasonableness or some relation to the public health, safety and welfare. See, e. g., United States v. O'Brien, 391 U.S. 367 at pp. 376, 377, 88 S.Ct. 1673 at p. 1679, 20 L.Ed.2d 672 (1968), and cases cited in footnotes; Griswold v. State of Connecticut, 381 U.S. 479 at pp. 497–498, 85 S.Ct. 1678 at pp. 1688–1689, 14 L.Ed.2d 510 (1965) and cases cited therein.

Respondents would have this court adhere to the proposition that "School District rules controlling student demeanor and appearance will not be overruled upon judicial review unless the rules appear to be arbitrary and capricious; or unless they bear no effective relationship to the educational process with which the schools are concerned; or, unless the rules violate a clearly defined constitutional right."

At the time of the hearing of this case before the trial court in the closing months of the 1968–69 school term, there were several cases from other jurisdictions dealing with this issue of the validity of rules adopted by school authorities regulating students' hair style and length, which cases were divided in ultimate conclusions. Cases relied upon by the trial court included: Ferrell v. Dallas Indep. School Dist., 392 F.2d 697 (5th Cir. 1968); Davis v. Firment, 269 F.Supp. 524 (E.D.La.1967); Leonard v. School Committee of Attleboro, 349 Mass. 704, 212 N.E.2d 468, 14 A.L.R.3d 1192 (Mass.1965). In each of these cases relied on by the trial court in its memorandum opinion, the rule of the particular school was upheld.

Cases decided at the time of the district court ruling herein which denied the validity of the particular rule were: Zachry v. Brown, 299 F.Supp. 1360 (N.D.Ala.1967); Finot v. Pasadena City Board of Education, 250 Cal.App.2d 189, 58 Cal.Rptr. 520 (1967), (involving a beard worn by a teacher).

Since the time of the trial court hearing there have been a number of other decisions dealing with this issue. Those which have upheld the validity of the rule include: Jackson v. Dorrier, 424 F.2d 213 (6th Cir. 1970); Brownlee v. Bradley County, 311 F.Supp. 1360 (E.D.Tenn.1970); Crews v. Cloncs, 303 F.Supp. 1370 (S.D.Ind.1969); Brick v. Board of Education, 305 F.Supp. 1316 (D.Colo.1969); Farrell v. Smith, 310 F.Supp. 732 (D.Maine 1970); Neuhaus v. Torrey, 310 F.Supp. 192 (N.D.Cal.1970) (where the school grooming rule was applied to athletes only).

Cases decided subsequent to the trial court's hearing which have held the particular rule invalid are: Richards v. Thurston, 424 F.2d 1281 (1st Cir. 1970); Breen v. Kahl, 419 F.2d 1034 (7th Cir. 1969); Griffin v. Tatum, 300 F.Supp. 60 (M.D.Ala. 1969); Westley v. Rossi, 305 F.Supp. 706 (D.Minn.1969); Meyers v. Arcata Union High School Dist., 269 Cal.App.2d 549, 75 Cal.Rptr. 68 (1969); Sims v. Colfax Community School Dist., 307 F.Supp. 485 (S.D. Iowa 1970) (dealing with female coiffure). Calbillo v. San Jacinto Junior College, 305 F.Supp. 857 (S.D.Texas 1969). See also:

Goldstein, "Reflections on Developing Trends in the Law of Student Rights," 118 U.Pa.L.Rev., p. 612 (1970); Goldstein, "The Scope and Sources of School Board Authority to Regulate Student Conduct and Status: A Non-Constitutional Analysis," 117 U.Pa.L.Rev., p. 373, (1969).

The issue in this and other similar "long hair" cases is well articulated by Goldstein, "Reflections on Developing Trends, etc.," supra, that issue being:

> " * * * whether, under our total legal system, and the presumptions of the societal and governmental systems within which it exists, the interest of the school system outweighs that of the student and his parent in making private decisions regarding personal appearance." Goldstein, supra, pp. 616–617.

Continuing, Goldstein states:

> " * * * Rather than merely comparing a regulation to some abstract quality of reasonableness or arbitrariness, current judicial scrutiny includes an examination of its asserted purpose and effect, the factual bases underlying this assertion, and the countervailing factors such as privacy and individual decision-making that are displaced if the rule is upheld. In essence, the courts not only are seeking to ask hard questions that the *Leonard* case [Leonard v. School Comm., [349 Mass. 704], 212 N.E.2d 468 (Mass.1965) and other early decisions such as Davis v. Firment, 269 F.Supp. 524 ([D.C.] 1968), which follow *Leonard*] avoided, but are also striving to answer them by weighing all of the relevant factors in order to reach an optimal balance. In resolving each case and reaching this often delicate balance, the courts are heavily influenced by a growing general feeling that in our society, privacy and individuality need protection." Goldstein at 617, supra.

 It must be recognized that the courts will, albeit reluctantly, intervene in conflicts which arise in the operation of the school systems if such conflicts "directly and sharply implicate basic constitutional values," Epperson v. Arkansas, 393 U.S. 97 at 104, 89 S.Ct. 266 at 270, 21 L.Ed.2d 228 (1968), and this will be done even if the disciplinary powers of school authorities will be diminished if the regulation is not upheld. The Constitution protects minor high school students as well as adults from unlawful governmental infringement on their constitutional rights. See e. g., West Virginia State Bd. of Education v. Barnette, 319 U.S. 624 at 637, 63 S.Ct. 1178 at 1185, 87 L.Ed. 1628 (1943); Tinker v. Des Moines Independent Community School Dist., 393 U.S. 503 at 506–507, 89 S.Ct. 733 at 736–737, 21 L.Ed.2d 731 (1969).

The scheme of authority as related to school boards has been discussed by Goldstein in his article "The Scope and Sources of School Board Authority to Regulate Student Conduct and Status: A Non-Constitutional Analysis," 117 U.Pa.L.Rev., 373 (1969). Therein he makes the point (and in our opinion, correctly so) that " * * * a school board has the power, and only that power, over student conduct and status which is properly related to its function of educating the pupils in its charge." (Supra, at 387). In other words, the school board has no general legislative power over the youth in its geographic territory. " * * * Forced conformity to a social value system is the function of the representative general legislature. Although we usually elect our school boards, as we do our state legislatures and municipal governments, we do not elect them to perform this general legislative function." (Supra, at 392).

As applied to the case at hand, the record reflects that the reason for the regulation was to assure tranquility in the school and to avoid confrontations between those students wearing long hair and other students—an attempt to avoid disturbances in the operation of the school. However, the record also reflects that Murphy's attendance at school and in his classes created no disturbance with the other students or with his teacher. The only time that trouble arose as regarding Murphy personally, was when the rule itself was being enforced.

We ultimately are faced with the question—upon what constitutional premise is the right to wear one's hair in any manner desired based?

The cases upholding a student's right to wear long hair have generally stated expressly or by implication that the right is based upon: the First Amendment—as within the periphery of "expression" (specifically as an extension of Tinker v. Des Moines Independent Community School Dist., supra); the Fifth Amendment—as part of the concept of substantive due process; the Ninth Amendment—as other rights not enumerated in the first eight amendments and which are retained by the people; the Fourteenth Amendment which makes the Bill of Rights applicable to the states and which also includes concepts of substantive due process and equal protection of the laws; a combination of the above enumerated amendments culminating in Justice Douglas' now famous "penumbras, formed by emanations" from a number of constitutional amendments which, taken as a whole, form a "zone of privacy" into which the state is not permitted to trespass. Griswold v. Connecticut, 381 U. S. 479, 484, 85 S.Ct. 1678, 1681, 14 L.Ed.2d 510 (1965).

In the Murphy case, possibly we could simply rely on the First Amendment since Murphy testified that his hair style involved expression of his individuality and of his philosophical attitudes. This could be done under an extension of *Tinker*, supra, and similar cases involving a mode of individual expression. This was done partially in Breen v. Kahl, supra. The problem with this approach, however, is that the test of what is "expression" becomes subjective rather than objective which could pose serious problems in future litigation in the First Amendment area. Also, as was stated in Richard v. Thurston, supra, 424 F. 2d at 1283, regarding how far the First Amendment should be expanded to protect modes of expression, " * * * as the non-verbal message becomes less distinct, the justification for the substantial protections of the First Amendment becomes more remote."

We could also uphold Murphy's right to wear his hair in any manner of his choosing since the right appears and has been held to be embodied in the concepts of "life" and/or "liberty" of the intentionally broad language of the Fifth and Fourteenth Amendments. " * * * as to each situation, the due process clause allows the courts to adjudge whether, in the circumstances, the right to life, to dissipate one's funds, to marital privacy, to breed children, to dress as one pleases *and the like* may be invaded by the state." (Abrams, "What are the Rights Guaranteed by the Ninth Amendment," 53 A.B.A. Journal 1033 at 1039). (Emphasis added.) The courts of this country have not been reluctant to uphold rights not specifically provided for under the broad due process clauses of the Fifth and Fourteenth Amendments. See, e. g., Richards v. Thurston, 424 F.2d 1281 at 1284 (1970).

Finally, but probably the most relevant constitutional premise of all, is the Ninth Amendment: "The enumeration in the Constitution, of certain rights, shall not be construed to deny or disparage others retained by the people." Neither from the words themselves nor from the records and other contemporaneous material concerning the creation of the Ninth Amendment is it exactly clear what "rights" are retained by the people. What is clear from an examination of the history and origin of the Ninth Amendment is that the absence of a specific constitutional provision dealing with the rights of privacy, personal taste, the right to be left alone, and the like, does not compel the conclusion that no such right exists. On the contrary, the opposite conclusion is compelled. As in the Fifth and Fourteenth Amendment due process cases which have interpreted and necessarily expanded what life, liberty and pursuit of happiness mean, the determination of *what* rights exist and in *which* situations under the broad and general language of the Ninth Amendment is clearly, and again necessarily, left to judicial determination.

■ Therefore, under both the Idaho Constitution, art. 1, §§ 1 and 21,[1] and under the Ninth Amendment of the United States Constitution made applicable to the states by the Fourteenth Amendment (under Griswold, supra), we hold the right to wear one's hair in a manner of his choice to be a protected right of personal taste not to be interfered with by the state unless the state can meet the "substantial burden" criteria similar to that set out in the cases holding in favor of the student, supra. For example, if it is established that the exercise of personal taste, as manifested by personal appearance, has substantially impaired some societal interest, then the state may intervene.

■ Thus, it is our conclusion that the respondents have failed to establish the "substantial burden of justification" essential to sustain the validity of this regulation. The record fails to reflect that there was any substantial health, safety, academic or disciplinary problem created by the wearing of long hair.

The judgment of the trial court is reversed and the cause remanded for further proceedings in conformity with the views expressed herein. Costs to appellant.

McQUADE, C. J., and DONALDSON, J., concur.

SHEPARD, Justice (dissenting).

I regret that I am forced to dissent in this case. This is a "long hair" case. I have no objection, dislike or distaste for any particular hair style worn by either male or female of any age. My acceptance of the hair styling of other human beings is tempered by my thinking that whatever the style it should be clean, reasonably neat (whatever that means) and present no danger to the health or safety of the individual or to others. In the case at hand, there appears to be no question but that the hair in question was clean, neat and presented no danger to the health or safety of Murphy or anyone else. My distaste is further compounded when I view the facts of this case in light of the opening language of the opinion of the court in Cordova v. Chonko, 315 F.Supp. 953 (U.S.D.C., N.D. Ohio, 1970) :

"This is another 'long hair' case. The plaintiff is a fourteen year old boy. The defendant school authorities and the boy's parents appear from the evidence to be functioning at about the same level of maturity. This simplifies the application of the old maxim 'All parties stand equal before the law.' "

We are not to speculate that the denial of certiorari by the United States Supreme Court carries with it any inference as to tacit affirmation of a lower court's decision. I think in the present matter, however, we may assume from the continued denial of certiorari by that court in "long hair" cases that that court is unwilling to devote its time and energies to dealing and coping with that large, constitutionally important question involving the length of hair. Or perhaps the court, in light of the dissent in Tinker v. Des Moines Independent Community School District, 393 U.S. 503, 89 S.Ct. 733, 21 L.Ed.2d 731, had decided to devote its energy to more significant tasks.

In any event, there is a large question in my mind as to whether any justiciable controversy is presented to this Court at this time. We are informed via the public press (but not by any of the parties hereto) that the regulation governing the length of hair of Pocatello School District No. 25 has been rescinded and presumably from the date of such rescission Murphy was free to take

---

1. Idaho Const. art. 1, § 1. Inalienable rights of man.—All men are by nature free and equal, and have certain inalienable rights, among which are enjoying and defending life and liberty; acquiring, possessing and protecting property; pursuing happiness and securing safety.

Idaho Const. art. 1, § 21. Reserved rights not impaired.—This enumeration of rights shall not be construed to impair or deny other rights retained by the people.

up his student career in the Pocatello School system. See Mr. Justice Black's concurrence in Epperson v. Arkansas, 393 U.S. 97, 89 S.Ct. 266, 21 L.Ed.2d 228.

I further disagree and respectfully dissent from certain of the language contained in the majority opinion. That opinion states:

"It must be noted that the traditional presumption of legislative validity does not apply to the substantive issues appellant raises under the First, Fifth, Ninth and Fourteenth Amendments. The United States Supreme Court has repeatedly required something more of legislation involving *fundamental rights* than merely some reasonableness or some relation to the public health, safety and welfare." (Emphasis added)

As hereinbefore pointed out, the United States Supreme Court has yet to hold that the desire of a student in the public schools to wear his hair in a fashion contrary to rules and regulations of the school district is a constitutional and "fundamental right" which automatically overcomes the "traditional presumption of legislative validity." The majority opinion cites as authority for its statements Griswold v. Connecticut, 381 U.S. 479, 85 S.Ct. 1678, 14 L.Ed.2d 510. I suggest that *Griswold* provides no authority for the statement of the majority herein and in fact dealt with another area of family life. The court therein stated:

"The present case, then, concerns a relationship lying within the zone of privacy created by several fundamental constitutional guarantees. And it concerns a law which, in forbidding the *use* of contraceptives rather than regulating their manufacture or sale, seeks to achieve its goals by means having a maximum destructive impact upon that relationship. * * * Would we allow the police to search the sacred precincts of marital bedrooms for telltale signs of the use of contraceptives? The very idea is repulsive to the notions of privacy surrounding the marriage relationship.

"We deal with a right of privacy older than the Bill of Rights—older than our political parties, older than our school system." (Emphasis original)

I suggest that the long step from the privacy of the marital bedroom to the corridors of the Pocatello School District building is one not to be taken as lightly and effortlessly as is done by the majority opinion.

I regret that, as pointed out in the majority opinion, a number of courts (almost exclusively federal district or circuit courts) have seen fit to devote their time, talent and energies to coping with that very large problem of the protection of the constitutional right to wear one's hair longer than might be desired by certain local school authorities. While deciding the case before it on a different basis, the court in Cordova v. Chonko, supra, stated:

"Whether a proper spirit and good judgment require that the students in Perrysburg High School must wear their hair cut short is a question to be determined by the Board of Education, after a proper study of the mores and wishes of the public, including the students and the faculty of its school, and not by this, or perhaps properly by any, court."

At this point one thing must be made clear. The record in the matter herein simply does not support the decision of the majority opinion. The witnesses called by plaintiff merely testified to the appearance of plaintiff while attending school and the fact that he, as an individual, did not disrupt or cause excessive disruption in the school. Plaintiff testified only that he wore his hair in the style complained of herein because he liked it that way and his father testified that he believed his son should be so entitled to wear his hair. On the other side of the coin, the school administration officials testified that there had been disruption caused by the wearing of long hair within the school building. What is even more important, however, is that the school board officials elected by the people of the Pocatello School District employed certain

administrative officials to operate that school system. One of those officials stated that in his opinion there was a direct relationship between the behavioral pattern of students in the schools and their appearance and dress, including the length of hair. The opinion was based upon the opinions of educators and school administrators, not only in the Pocatello School District but throughout the state. That testimony stands unchallenged and uncontroverted.

I thoroughly and emphatically disagree with the opinion as stated by the school administration officials. In my judgment, there is no such necessary relationship between behavioral pattern and attitude or disciplinary problems and the length of hair. My opinion is otherwise. I, for example, can remember when the butch or crew haircut was decidedly frowned upon by school officials as being too great a departure from the norm and therefore bound to bring about problems if permitted in the schools. I can also remember the coming and the going of the popularity of the so-called "mohawk" haircut in which the entire head was shaved with the exception of one strip an inch or so wide of hair standing straight up running front to back across the skull. I can also remember the stir caused by the adoption of certain young ladies in the wearing of the Veronica Lake style hair. I imagine that much the same type of stir was caused when girls hair first came to be bobbed. It is a matter of record that the female of the species was not too long ago forbidden to wear lipstick or other makeup while attending school. All of these things have and will continue to come and then pass away much I suppose as the more recent controversy about the length or lack thereof of the skirts of female students.

But nevertheless, the fact that my judgment differs from that of the school administrators is of no significance. They have been hired by the public to administer the affairs of our schools, supposedly on the basis of education, training, experience and expertise. I have always assumed that the public employed me in a somewhat different capacity. While I may disagree with their judgment, I must admit that my credentials in the educational field are less impressive than those of the administrators. Evidently the majority labors under no such problem.

The majority opinion, in my judgment, goes far afield in attempting to find a reason to strike down the regulation of the school board in the case at bar. The majority opinion indicates that the courts will "albeit [it] reluctantly, intervene in conflicts which arise in the operation of the school system if such conflicts 'directly and sharply implicate basic constitutional values.'" Epperson v. Arkansas, supra. As has been previously pointed out herein, there is no ruling to date from the United States Supreme Court indicating that the ability to wear hair at a longer length than that prescribed by school board regulations is a "basic constitutional value." Further, I would point out that Epperson involved a school teacher allegedly caught between the horns of a dilemna, one of which required her to teach the Darwinian theory of evolution and the other which, under the sanction of criminal penalties, forbade her to teach such a doctrine. That case was decided by the court on the basis of the establishment of religion clause of the first amendment to the United States Constitution, and I suggest that since Murphy did not claim or assert any religious basis for the length of his hair, that there is no solace for the majority opinion in Epperson. Correlatively, however, the court in Epperson did state:

"By and large, public education in our Nation is committed to the control of state and local authorities. Courts do not and cannot intervene in the resolution of conflicts which arise in the daily operation of school systems and which do not directly and sharply implicate basic constitutional values."

Perhaps it is on the basis of such language that the high court has been reluctant to grant certiorari in long hair cases.

The majority opinion cites as additional authority West Virginia State Board of Education v. Barnette, 319 U.S. 624, 63 S. Ct. 1178, 87 L.Ed. 1628, and Tinker v. Des Moines Independent Community School District, supra. *Barnette* involved the compelling of pupils in public schools to salute the flag although their religious beliefs forbade them to do so and was decided by the court on an entirely different basis than any urged or used by the majority herein. *Tinker* involved the wearing of black armbands as a symbolic act of protest to the Viet Nam war by grammar school pupils. Although the court upheld the right of those children to so act, it did so on the basis that the pupils were entitled to freedom of speech. The opinion of the court in *Tinker* stated, among other things:

"On the other hand, the Court has repeatedly emphasized the need for affirming the comprehensive authority of the States and of school officials, consistent with fundamental constitutional safeguards, to prescribe and control conduct in the schools. * * *

"The problem posed by the present case does not relate to regulation of the length of skirts or the type of clothing, to hair style, or deportment."

Mr. Justice Black points out in his dissent that some of the defiant pupils who sought the assistance of the United States Supreme Court to assure them their "constitutional" right to protest the Viet Nam war by wearing black armbands to school were as young as eight years old.

The majority opinion, and I believe properly, rejects the first amendment to the United States Constitution as a basis for overturning the regulation in the case at bar. The majority opinion then hints that it might strike down the regulation under the language of the fifth and fourteenth amendments, but does not specifically do so. The majority opinion states:

"* * * but probably the most relevant constitutional premise of all, is the Ninth Amendment: 'The enumeration in the Constitution, of certain rights, shall not be construed to deny or disparage others retained by the people.' "

The court then states:

"What is clear from an examination of the history and origin of the Ninth Amendment is that the absence of a specific constitutional provision dealing with the rights of privacy, personal taste, the right to be left alone, and the like, does not compel the conclusion that no such right exists."

In short, what the majority opinion tells us today is that all discipline or regulation in any public school in the state of Idaho which is repugnant to the feelings of any child from kindergarten through high school that his "right of privacy," "right of personal taste," "the right to be left alone," and "the like," is prima facie unconstitutional if challenged by that child, and the administration is required to prove by a "substantial burden of justification" that the validity of the regulation is essential. I suggest that such theory logically terminates in this, or some other court, administering the public school system of the state. This I am unwilling to do.

SPEAR, Justice (special concurring dissent).

I concur with the dissenting opinion authored by Justice Shepard except that I do not want to be understood to deem the question before this court as being trivial. As stated in Cordova v. Chonko, 315 F. Supp. 953, 959 (U.S.D.C., N.D.Ohio, 1970):

"In the ages old conflict between the right of the individual to be himself, to be let alone, and the right of society to have reasonable peace and order, the stakes are too high to permit any simple or easy resolution of the dispute."

I am also fully in accord with the author of *Cordova*, supra, when he wrote:

"It is obvious that the problem presented by the facts of this case [almost 4-square with the facts of the case at hand] cannot be solved by reference to cases concerned with the constitutional rights and liberties of adults. Children

of necessity cannot be uncritically accorded these rights, and it is foolish to say that they can be."

* * * " 'Some * * * seem to forget what the wise parent knows, for example, that children really are not adults. They do not come to life fully equipped with knowledge and wisdom, like Minerva springing full-panoplied from the brow of Jove. They are not like insects which are hatched complete with all the instincts they need to complete their life cycle. On the contrary, human children start life completely helpless, and must come to the rights and privileges of adulthood by slow degrees. In that process, restraints to which adults are not subject are absolutely essential. I defy anyone to look back at his own childhood without finding at least one occasion when he felt his liberty had been severely restricted. Yet, as adults we impose the same restrictions on our own children because maturity has shown us the reasons and necessities for restraint.' " 315 F.Supp. 953, 960. (Quoting in part, from the author's article in Journal of the American Judicature Society, October, 1960, Vol. 44, p. 97.)

Thus I suggest that to properly resolve the issues presented in this case, we must resort to what used to be referred to as "common horse sense."

The role of the state to children in school is a parental one often being described as one in *loco parentis.* However, the state should be a wise parent, not a foolish or indulgent one. Kent v. United States, 383 U.S. 541, 86 S.Ct. 1045, 16 L.Ed.2d 84 (1966). It is incumbent upon the state through its regularly elected officers of the various school districts to promulgate reasonable rules governing the behavior of the students toward the school faculty and administrators and toward other students while in attendance at the school.

I have carefully searched the record in this case and I find not one scintilla of evidence that the more specific rules promulgated by the principal of the Highlands High School under the general rules promulgated some ten years previously by the Board of Trustees of the school district were in any manner "unreasonable" or "arbitrary." Yet one of the rules relative to the length of hair worn by male students was intentionally violated by Chris Murphy, the minor plaintiff and appellant in this action.

I am certain it would have been a much easier course for the school authorities, in view of the position held by John Murphy (the minor's father) in the school system in Pocatello, to have ignored this infraction for the remainder of the minor's senior school year. However, to me it seems extremely important that our young people in high school be taught, among other things, how to live with others in everyday life. Where better than in high school (if they have not previously been taught at home) can young people be taught that no matter what station they may attain in life, either socially or economically, they are going to be subject to certain rules and regulations, many of which may not exactly please them. It is also important to teach these students at this impressionable age, that violation of those rules or regulations will most likely result in punishment or hardship.

It follows, of course, that such rules must necessarily be reasonable and contribute toward good order and discipline in the school, and there must be provided a procedure for review of any punishments meted out for infractions of those rules. Two of the administrators, both of whom had impressive records as teachers and school administrators, testified that the rule or policy concerning the length of hair on male students was good and justified. One expressed the reason for the rule as follows:

* * * "[T]he feeling [from the secondary principals in the city of Pocatello] was that gross deviations from normal student dress and haircut patterns tend to create distractions and disturbances and do have an unsatisfactory effect upon learning and conduct. * * *

The principals felt that if a student's appearance was a studied effort to draw attention to himself, then his presence in the classroom was just as disruptive as if he had made some verbal remark, rude remark of some type."

Concerning the school rule on student dress, the other testified:

"It's very basic; it's a means by which we can adopt some standards and some control and live within the confines of the school building with 1,217 students and 66 staff members."

As I have previously pointed out, there is a total lack of any evidence that this basic policy on student dress, which included the length of hair on male students, was unreasonable.

As for right of review, the appellants, both father and minor, as well as their attorney, were duly advised several times of the procedure to follow should an appeal or review of the suspension be desired. In the discipline section of the policy manual of the school district, provision is made for any suspension of a student by a principal to be reviewed first by the superintendent and then by the Board of Education. Appellants did not avail themselves of these administrative procedural reviews, but they were available and made known to them and their counsel.

Thus all requirements were met, and none of the minor appellant's constitutional rights were trampled upon. He merely, for personal whims of his own, decided he would not obey a reasonable rule adopted by the proper school authorities. He was given every opportunity to comply, as he had the two previous years; and, when he intentionally refused to do so, he left the authorities no alternative except to suspend him.

I am in full accord with the main thrust of the dissenting opinion of Justice Shepard herein, and the basic theory or policy expressed in the dissenting opinion of Justice Black in Tinker v. Des Moines Independent Community School District, 393 U.S. 503, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969).

Expressed succinctly, the courts of the land should not substitute themselves for the elected officials of the state in the realm of controlling the students in public supported schools. I join Justice Shepard in doubting the competency or adequacy of this court to substitute its judgment for the judgment of all the elected boards of trustees of all the school districts in the State of Idaho relative to rules and regulations dealing with "student dress" of students while attending their respective schools. Yet this is the effect of the majority opinion herein.

Therefore the order of the trial court denying appellants' writ of mandamus and dismissing their petition should be affirmed.