Russell BREESE, Father and next friend of Michael Breese, a minor, Appellant,

v.

Elmer C. SMITH, Principal, Main Junior High School, George E. Taylor, Superintendent, Fairbanks North Star Borough School District, et al., Appellees.

No. 1614.

Supreme Court of Alaska.

Sept. 11, 1972.

Stephen C. Cowper, Fairbanks, for appellant.

Charles E. Cole, Fairbanks, for appellees.

Before BONEY, C. J., RABINOWITZ, CONNOR and ERWIN, JJ., and VICTOR D. CARLSON, Superior Court Judge.

## OPINION

RABINOWITZ, Justice.

This appeal requires that we resolve a hair length controversy arising from the enforcement of a junior high school grooming regulation. If the regulation in the case at bar is upheld, the student will be denied a public education unless he conforms his hair style to the regulation's standards.

Michael Breese enrolled in the seventh grade class at Main Junior High School in Fairbanks on September 13, 1971, shortly after the fall term had begun. Some three years prior thereto, Elmer C. Smith, principal of Main, had promulgated an unwritten hair regulation which required that male students' "hair must not be down over the ears, over the eyes, . . . [or] over the collar."

From the date of his enrollment, the length of Breese's hair violated the school regulation. School officials immediately informed Breese that his hair length was out of conformity with the rule and that his hair would have to be cut. With the knowledge and support of his father, Breese refused to cut his hair to the school standards. Smith suspended Breese from Main on September 21, 1971. Thereafter, Smith recommended to the School Board, Fairbanks North Star Borough School District, that Breese be expelled for wilful disobedience of the hair regulation.[1]

On September 22, 1971, an action in Breese's behalf was commenced in superior court seeking injunctive relief. Five days later, the superior court issued an ex parte

1. AS 14.30.045 sets forth the statutory grounds for the suspension or denial of admission of a pupil from public schools. More precisely, that enactment provides in relevant part:

A school age child may be suspended from or denied admission to the public school which he is otherwise entitled to attend only for the following causes:

(1) continued wilful disobedience or open and persistent defiance of reasonable school authority; . . .

Suspension and expulsion regulations in effect, but not officially adopted by

temporary restraining order enjoining Smith and the Superintendent of Schools of the Fairbanks North Star Borough School District from denying Breese permission to attend classes until a hearing could be held on Breese's application for a preliminary injunction.

On the evening of October 7, 1971, the School Board convened and held a hearing to consider Smith's recommendation that Breese be expelled. After hearing Smith's testimony and other witnesses called by Smith, no testimony having been adduced in Breese's behalf, the Board accepted the recommendation, and expelled Breese on the following day. Thereafter a hearing on the merits of Breese's application for

preliminary injunction was held in the superior court on October 15, 1971.[2] The parties produced conflicting evidence concerning the effects of Breese's hair, the effects of long hair generally, and the causal relationships between long hair, disruptive behavior, and academic performance. The superior court subsequently entered a memorandum opinion and order in which it found the school's hair regulation reasonable, entered judgment against Breese, and dissolved the outstanding temporary restraining order. Breese now appeals the decision of the superior court.[3]

■ Initially, we are confronted with the threshold question of whether this

---

the School Board, at the time of Breese's ouster, are contained in policy statement number 5110.4, which provides in relevant part:

1. Suspension:

The responsibility for suspension rests with the building principals. Suspension shall be for a period of time not to exceed three (3) days. The parent must be notified immediately. A student who has been suspended can be readmitted only after the parents have scheduled a conference with the principal and any necessary members of his staff that are involved with pupil services. Should parents fail to comply and the student remains absent, the parents shall be considered as violators of the Compulsory Attendance Law, and action as dictated by Statute will follow.

If a student fails to correct the conditions that led to his suspension, expulsion may become necessary.

2. Expulsion:

The responsibility for expulsion rests with the Board of Education. Expulsion must be recommended by the building principal and the Director of Special Services. A hearing shall be conducted with the parents or guardian to determine the facts regarding pending charges or misconduct. Following such a hearing, the administration will submit its findings, along with recommendations, to the Board of Education concerning all expulsions. Expulsion is for an indefinite period of time, and readmittance can occur only when it can be established that corrective measures to prevent reoccurrence of the cause have been taken. Readmission

from expulsion may be made by the Superintendent of Schools after the parents have met with the school principal and those of his staff working with pupil services. Following such a meeting, the Superintendent of Schools will review the recommendation of the principal and will make a final decision regarding the issue of readmisson. The Board of Education shall be informed regarding all readmissions.

2. The superior court tried the matter de novo rather than as an appellate tribunal reviewing a determinination of an administrative body. This is made clear by the trial court's remarks made at the preliminary injunction hearing:

I believe that this would be in the nature of an action and establish plaintiff's rights under the constitution.

Later, at the hearing on the merits, the lower court reiterated his interpretation of the proceedings before him:

Courts usually sit in the role of reviewing the record and finding and determining whether there has been a sufficient amount of evidence to support such a finding and is usually not called upon a make an initial judgment in the case. I distinguish this case  .   .   .

3. Breese's subsequent application for an injunction pending appeal was denied by the superior court on October 29, 1971. After hearing oral argument on the merits of Breese's appeal on December 6, 1971, we issued an order enjoining appellees from denying Breese, on the sole basis of the length of his hair, permission to attend regular classes at Main, pending final determination of this appeal.

court possesses appellate jurisdiction to consider the superior court's decision. Breese contends that the lower court's memorandum opinion and order constitute a "final judgment" within the intendment of Rule 6 of the Alaska Supreme Court Rules [4] and AS 22.05.010,[5] and that therefore the jurisdiction of this court is properly invoked. Smith and the School Board, on the other hand, urge that the superior court's decision is not a "final judgment" within the meaning of Rule 6, but rather, is an interlocutory order dissolving an injunction and reviewable only under Rule 23(a).[6] Rule 27 [7] provides that a petition for review must be filed within ten days, or if "good cause" for an extension of time is shown, then within an additional ten day period. Smith and the School Board argue that since review of an interlocutory order may be obtained only by way of petition for review, and that in the instant case, no such petition was timely filed by Breese, this court lacks appellate jurisdiction and the appeal must be dismissed.

We are persuaded that Breese's interpretation of the superior court's decision is correct. The superior court's memorandum opinion and order constitute a "final judgment" within the meaning of Rule 6. We have in the past interpreted a memorandum opinion as a "final judgment" for purposes of appeal where such opinion "clearly evidences the judge's intent to presently and finally dispose" of the matter pending before him.[8] Here, there is no question that the superior court intended to completely and finally dispose of Breese's complaint for injunctive relief. In its opinion, the superior court did more than merely dissolve the outstanding temporary restraining order; it also considered the parties' claims and evidence, balanced the competing interests in favor of the "orderly management of our schools," held that the administrative hair regulation is a "reasonable regulation," and rendered judgment in favor of Smith and the School Board. The superior court, in short, manifested its intention to finally dispose of Breese's claim for relief. We therefore conclude that this court possesses appellate jurisdiction in the case at bar.[9]

We next turn to the merits of this litigation. In regard to this the superior court,

---

4. Sup.Ct.R. 6 provides:
   An appeal may be taken to this court from a final judgment entered by the superior court or a judge thereof in any action or proceeding, civil or criminal, except that the state shall have a right to appeal in criminal cases only to test the sufficiency of the indictment or on the ground that the sentence is too lenient.

5. AS 22.05.010(a) provides in relevant part:
   The supreme court has final appellate jurisdiction in all actions and proceedings. . . . An appeal to the supreme court is a matter of right . .

6. Sup.Ct.R. 23 provides in relevant part:
   An aggrieved party may petition this court for review of any order or decision of the superior court, not otherwise appealable under Rule 6, in any action or proceeding, civil or criminal, as follows:
   (a) From interlocutory orders granting, continuing, modifying, refusing or dissolving injunctions, or refusing to dissolve or modify injunctions.

7. Sup.Ct.R. 27(a) provides:
   A petition for review shall be deemed in time when it is filed with the clerk of this court within ten (10) days after the making of such order or decision. A justice of this court for good cause shown, may extend the time for filing in such cases for an additional period of ten (10) days.

8. In Re Mountain View Public Utility District No. 1, 359 P.2d 951, 954 (Alaska 1961).

9. Assuming arguendo that Smith's and the School Board's characterization of the proceeding below is correct and we have a situation where the order in question lacks finality, we would not be bound to dismiss Breese's appeal. As we said in In Re Mountain View Public Utility District No. 1, 359 P.2d 951 (Alaska 1961):
   Our rules provide for review of interlocutory orders, and to prevent hardship and injustice this court on its own motion could treat the appeal as a petition for review and decide the questions presented to the same extent and with the same effect as on an appeal. 359 P.2d at 954. (footnotes omitted).

in its memorandum opinion and order, stated in part that:

> The Board's decision should stand unless it flies in the face of a constitutionally prohibited interference to a citizens [sic] rights. This Court is not persuaded that it has.

In reviewing the superior court's decision, this court is called upon to determine whether the trial court erred in holding that none of Breese's constitutional rights had been violated by the School Board's decision to expel him for wilful disobedience of the hair length regulation in question. Resolution of this issue in turn involves consideration of the question of whether a male junior high school student's decision to fashion his own appearance by adopting a long hair style [10] is constitutionally protected. The trial court found no express constitutional guarantee of the right to wear long hair in school and further concluded that such right could not be found within the parameters of any emerging constitutional notion of "right to privacy." [11]

The United States Supreme Court has not yet passed on the question of whether a student's personal appearance is constitutionally protected. In the landmark case of Tinker v. Des Moines Independent Community School District,[12] wherein the Supreme Court of the United States held that junior high school students had a right under the first amendment to wear black armbands in school in order to dramatize their opposition to the Vietnam war, the question of hair styles was expressly distinguished. In that case, the Court stated:

> The problem posed by the present case does not relate to regulation of the length of skirts or the type of clothing, to hair style, or deportment.[13]

Since Tinker, the Supreme Court has consistently declined to consider the matter of school hair regulations and dress code. For example, the Court recently denied a petition for certiorari in Swanquist v. Livingston,[14] thereby leaving a Seventh Circuit decision standing which invalidated a hair regulation. In the same term the Supreme Court's denial of certiorari in Olff v. East Side Union High School District [15] left undisturbed a Ninth Circuit ruling that a public school district's long hair regulation did not violate the first amendment, right to privacy, fundamental liberties or due process rights.[16]

The question of personal appearances in public classrooms is one of the liveliest of current constitutional issues, and the after-

10. For purposes of this opinion, we accept the parties' definition of "long hair": hair which falls over a male student's eyes, ears or collar.

11. In this regard, the superior court stated:
(No constitutional provision known to this writer makes reference to hair or any appearance per se as does other rights provisions such as speech, assembly, arms, counsel, incrimination, religion, etc.) . . . Accordingly, even if this court were to accept the right as established, the right must still run the gauntlet of a determination of the reasonableness of the administrative regulation . . . .

12. 393 U.S. 503, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969).

13. Id. at 507–508, 89 S.Ct. at 737, 21 L.Ed.2d at 738.

14. No. 18663 (7th Cir., May 27, 1971), cert. denied, 404 U.S. 983, 92 S.Ct. 445, 30 L.Ed.2d 367 (1971).

15. 445 F.2d 932 (9th Cir.), cert. denied, 404 U.S. 1042, 92 S.Ct. 703, 30 L.Ed.2d 736 (1972).

16. King v. Saddleback Junior College District, [also Olff], 445 F.2d 932 (9th Cir. 1971); see also, Jackson v. Dorrier, 424 F.2d 213 (6th Cir.), cert. denied, 400 U.S. 850, 91 S.Ct. 55, 27 L.Ed.2d 88 (1970); Breen v. Kahl, 419 F.2d 1034 (7th Cir. 1969), cert. denied, 398 U.S. 937, 90 S.Ct. 1836, 26 L.Ed.2d 268 (1970); Stevenson v. Board of Educ. of Wheeler County, Georgia, 426 F.2d 1154 (5th Cir.), cert. denied, 400 U.S. 957, 91 S.Ct. 355, 27 L.Ed.2d 265 (1970); Ferrell v. Dallas Indep. School Dist., 392 F.2d 697 (5th Cir.), cert. denied, 393 U.S. 856, 89 S.Ct. 98, 21 L.Ed.2d 125 (1968).

math of *Tinker* has witnessed a great proliferation of student-initiated suits in this area. In the absence of a definitive interpretation by the United States Supreme Court on the question of whether students have any constitutionally protected freedom to govern their individual appearances, the various circuits and district courts of the federal judiciary which have considered the matter are in disagreement.[17] Similarly, the decisions of state courts which have considered the issue are also reflective of divergent views.[18]

State and federal courts which have invalidated school hair regulations lack uniformity as to the precise nature and source of the students' rights. As a result, a variety of federal constitutional theories have been advanced.[19] Some courts have embraced a first amendment rationale, made applicable to the states under the fourteenth amendment, and have held that long hair is a constitutionally protected form of expression.[20] Others [21] have grounded their opinions on a ninth amendment justification.[22] Under this theory, "re-

17. Hair regulations have been invalidated by the First Circuit, Richards v. Thurston, 424 F.2d 1281 (1st Cir. 1970); the Third Circuit, Stull v. School Board of the Western Beaver Jr.-Sr. H. S., 459 F.2d 339 (3d Cir. 1972); the Fourth Circuit, Massie v. Henry, 455 F.2d 779 (4th Cir. 1972); the Seventh Circuit, Breen v. Kahl, 419 F.2d 1034 (7th Cir. 1969), cert. denied, 398 U.S. 937, 90 S.Ct. 1836, 26 L.Ed.2d 268 (1970); Swanquist v. Livingston, No. 18663 (7th Cir., May 27, 1971), cert. denied 404 U.S. 983, 92 S.Ct. 445, 30 L.Ed.2d 367 (1971); Crews v. Cloncs, 432 F.2d 1259 (7th Cir. 1970); Arnold v. Carpenter, 459 F.2d 939 (7th Cir. 1972); and the Eighth Circuit, Bishop v. Colaw, 450 F.2d 1069 (8th Cir. 1971).

    Hair regulations have been upheld by the Fifth Circuit, Ferrell v. Dallas Indep. School Dist., 392 F.2d 697 (5th Cir.), cert. denied, 393 U.S. 856, 89 S.Ct. 98, 21 L.Ed.2d 125 (1968); Wood v. Alamo Heights Indep. School Dist., 433 F.2d 355 (5th Cir. 1970); Stevenson v. Board of Educ. of Wheeler County, Georgia, 426 F.2d 1154 (5th Cir.), cert. denied, 400 U.S. 957, 91 S.Ct. 355, 27 L.Ed.2d 265 (1970); Karr v. Schmidt, 460 F.2d 609 (5th Cir. 1972); the Sixth Circuit, Jackson v. Dorrier, 424 F.2d 213 (6th Cir.), cert. denied, 400 U.S. 850, 91 S.Ct. 55, 27 L.Ed.2d 88 (1970); Gfell v. Rickelman, 441 F.2d 444 (6th Cir. 1971); the Ninth Circuit, King v. Saddleback Junior College Dist., 445 F.2d 932 (9th Cir. 1971); Olff v. East Side Union High School Dist., 445 F.2d 932 (9th Cir. 1971), cert. denied, 404 U.S. 1042, 92 S.Ct. 703, 30 L.Ed.2d 736 (1972); and the Tenth Circuit, Freeman v. Flake, 448 F.2d 258 (10th Cir. 1971). *See also*, Note, 84 Harv.L.Rev. 1702, 1703 n. 4 (1971).

18. State court cases in which school hair regulations have been successfully at-

tacked by student litigants include: Komadina v. Peckham, 13 Ariz.App. 498, 478 P.2d 113 (1970); Meyers v. Arcata Union High School Dist., 269 Cal.App. 2d 549, 75 Cal.Rptr. 68 (1969); Finot v. Pasadena City Bd. of Educ., 250 Cal. App.2d 189, 58 Cal.Rptr. 520 (1967); Yoo v. Moynihan, 28 Conn.Sup. 375, 262 A.2d 814 (1969); Conyers v. Glenn, 243 So.2d 204 (Fla.App.1971); Murphy v. Pocatello School Dist. #25, 94 Idaho 32, 480 P.2d 878 (1971); Laine v. Dittman, 125 Ill.App.2d 136, 259 N.E.2d 824 (1970).

    State court student challenges to hair regulations were unsuccessful in Leonard v. School Comm. of Attleboro, 349 Mass. 704, 212 N.E.2d 468 (1965); Shows v. Freeman, 230 So.2d 63 (Miss.1969).

19. *See generally* Note, 84 Harv.L.Rev. 1702 (1971); Comment, 55 Iowa L.Rev. 707 (1971); Goldstein, Reflections on Developing Trends in the Law of Student Rights, 118 U.Pa.L.Rev. 612 (1970).

20. *See, e. g.*, Breen v. Kahl, 419 F.2d 1034, 1036 (7th Cir. 1969), cert. denied, 398 U.S. 937, 90 S.Ct. 1836, 26 L.Ed.2d 268 (1970); Meyers v. Arcata Union High School Dist., 269 Cal.App.2d 549, 75 Cal.Rptr. 68 (1969).

21. *See, e. g.*, Breen v. Kahl, 419 F.2d 1034, 1036 (7th Cir. 1969), cert. denied, 398 U.S. 937, 90 S.Ct. 1836, 26 L.Ed.2d 268 (1970); Komadina v. Peckham, 13 Ariz. App. 498, 478 P.2d 113 (1970); Murphy v. Pocatello School Dist. #25, 94 Idaho 32, 480 P.2d 878 (1971); Laine v. Dittman, 125 Ill.App.2d 136, 259 N.E.2d 824 (1970).

22. The ninth amendment of the Constitution of the United States provides:

    The enumeration in the Constitution, of certain rights, shall not be construed to deny or disparage others retained by the people.

tained rights" under the ninth amendment are binding on the states by virtue of the fourteenth amendment. Still other courts have resorted to the equal protection clause of the fourteenth amendment to invalidate hair regulations for male high school students.[23] Several authorities have struck down hair length regulations as being unconstitutional deprivations of liberty [24] under the due process clause of the fourteenth amendment. The emerging notion of the "right to privacy," as found within the penumbra of the Bill of Rights mentioned by Justice Douglas in Griswold v. Connecticut,[25] has also been advanced as the constitutional source of a student's right to wear long hair.[26]

■ In view of the conflict between the circuits in the federal judiciary, and the general lack of consensus among the authorities over federal constitutional theory, counsel for Smith and the School Board urges that this court abstain from deciding whether Breese has any rights under the federal constitution. We are inclined to agree with appellees that in the instant case avoidance of the federal thicket is the

better course. We also concur, however, in Judge Breitenstein's observation, made in Freeman v. Flake,[27] that:

The states have a compelling interest in the education of their children. The states, acting through their school authorities and their courts, should determine what, if any, hair regulation is necessary to the management of their schools.[28]

Thus, whether Breese has a constitutional right to wear long hair and whether the school's hair length regulation is valid will be decided under Alaska's constitution.

Two provisions of Alaska's constitution are relevant in the instant case. First, article I, section 1 affirms that all persons in the state of Alaska are granted certain inherent and natural rights. More precisely, that section states:

This constitution is dedicated to the principles that all persons have a natural right to life, liberty, the pursuit of happiness, and the enjoyment of the rewards of their own industry; that all persons are equal and entitled to equal rights, opportunities, and protection under the

The ninth amendment for purposes of constitutional litigation, was recently revived from obscurity by Justice Goldberg's concurring opinion in Griswold v. Connecticut, 381 U.S. 479, 486, 85 S.Ct. 1678, 14 L.Ed.2d 510, 516 (1965).

23. *See, e. g.,* Ferrell v. Dallas Indep. School Dist., 392 F.2d 697, 705 (5th Cir. 1968) (Tuttle dissenting); Calbillo v. San Jacinto Junior College, 305 F.Supp. 857 (S.D.Tex.1969); Miller v. Gillis, 315 F.Supp. 94 (N.D.Ill.1969); Zachry v. Brown, 299 F.Supp. 1360 (N.D.Ala.1967). *See generally* Note, Long Hair and the Equal Protection Clause: King v. Saddleback Junior College District, 1 U.C.L.A.-Alaska L.Rev. 134 (1972).

24. *See, e. g.,* Stull v. School Bd. of Western Beaver Jr.-Sr. H. S., 459 F.2d 339 (1972); Richards v. Thurston, 424 F.2d 1281 (1st Cir. 1970); Conyers v. Glenn, 243 So.2d 204 (Fla.App.1971); Sims v. Colfax Community School Dist., 307 F.Supp. 485 (S.D.Iowa 1970); Griffin v. Tatum, 300 F.Supp. 60 (M.D.Ala. 1969); Breen v. Kahl, 296 F.Supp. 702

(W.D.Wis.1969); Westley v. Rossi, 305 F.Supp. 706 (D.Minn.1969).

25. 381 U.S. 479, 484–485, 85 S.Ct. 1678, 14 L.Ed.2d 510, 514–515 (1965).

26. Crossen v. Fatsi, 309 F.Supp. 114 (D.Conn.1970); Yoo v. Moynihan, 28 Conn.Sup. 375, 262 A.2d 814 (1969); Note, 84 Harv.L.Rev. 1702, 1711 (1971).

Similarly some writers contend that such right is one of the "fundamental rights" not explicitly enumerated in the Bill of Rights but located within the "emanations" of those guarantees. *See* Griswold v. Connecticut, 381 U.S. at 484, 85 S.Ct. 1678, 14 L.Ed.2d at 514–515; Note, *supra* note 23, at 143–49. Finally, at least one scholar has argued that under a non-constitutional analysis, school boards lack legitimate "power to dictate the length of boys' hair." Goldstein, The Scope and Sources of School Board Authority to Regulate Student Conduct and Status: A Non-constitutional Analysis, 117 U.Pa.L.Rev. 373, 400, 422 (1969).

27. 448 F.2d 258 (10th Cir. 1971).

28. *Id.* at 261.

law; and that all persons have corresponding obligations to the people and to the State.

The second relevant provision is article VII, section 1, which guarantees all children of Alaska a right to public education. This section of Alaska's constitution provides:

> The legislature shall by general law establish and maintain a system of public schools open to all children of the State, and may provide for other public educational institutions. . . .

■ While some of the terms of article 1, section 1 parallel the language of various federal constitutional provisions,[29] we have repeatedly held that this court is not obliged to interpret our constitution in the same manner as the Supreme Court of the United States has construed parallel provisions of the federal Constitution.[30] Thus, in the case at bar, although sound analysis requires that we look to the various federal precedents that have interpreted provisions of the federal constitution that parallel Alaska's constitution, we are not necessarily limited by those precedents in expounding upon Alaska's constitution.

■ Given this backdrop of constitutional interpretation we begin with the established premise that children are possessed of fundamental rights under the Alaska constitution.[31] Moreover, we have previously stated that children's constitutional rights will not be denied in deference to governmental benevolence or popular social theories.[32] Our decisions in RLR v. State [33] and other cases involving constitutional rights of children are in accord with the United States Supreme Court's statement in *Tinker* that:

> Students in school as well as out of school are "persons" under our Constitution. They are possessed of fundamental rights which the State must respect, just as they themselves must respect their obligations to the State.[34]

29. *Compare* the following language of the due process clause of the fourteenth amendment, which provides:
   [N]or shall any State deprive any person of life, liberty, or property, without due process of law . . . .
   and the due process clause of the fifth amendment which provides:
   No person shall . . . be deprived of life, liberty, or property, without due process of law . . . .
   *with* the language of the Declaration of Independence:
   We hold these truths to be self-evident, that all men are created equal, that they are endowed by their Creator with certain inalienable Rights, that among these are Life, Liberty and the pursuit of Happiness. . . .

30. Specifically in Roberts v. State, 458 P.2d 340 (Alaska 1969), this court said:
   [W]e are not limited by decisions of the United States Supreme Court or the United States Constitution when we expound our state constitution; the Alaska Constitution may have broader safeguards than the minimum federal standards. 458 P.2d at 342–343 (footnote omitted).
   More recently, we reiterated this position in Baker v. City of Fairbanks, 471 P.2d 386 (Alaska 1970), stating that:

[W]e have recognized that we are at liberty to make constitutional progress in Alaska by our own interpretations, as long as we measure up to the national standards which are required by the United States Supreme Court. It is our duty to move forward in those areas of constitutional progress which we view as necessary to the development of a civilized way of life in Alaska. 471 P.2d at 401.
   *See also* State v. Browder, 486 P.2d 925, 936 (Alaska 1971).

31. RLR v. State, 487 P.2d 27 (Alaska 1971); *see* Doe v. State, 487 P.2d 47 (Alaska 1971).

32. In RLR v. State, 487 P.2d 27 (Alaska 1971), we noted:
   If an honest analysis of constitutional requirements leads us to believe that they apply to children, we lack authority to withhold their application in deference to a popular social theory. 487 P.2d at 31 (footnote omitted).

33. 487 P.2d 27 (Alaska 1971).

34. 393 U.S. at 511, 89 S.Ct. at 739, 21 L.Ed.2d at 740. We note that children have also been accorded constitutional status under the federal Constitution by the United States Supreme Court. Tinker v. Des Moines Indep. Community

■ We hold that under article I, section 1 of the Alaska constitution's affirmative grant to all persons of the natural right to "liberty," students attending public educational institutions in Alaska possess a constitutional right to wear their hair in accordance with their personal tastes. In reaching this conclusion, we are cognizant of the fact that the term "liberty" is an illusive concept, incapable of definitive, comprehensive explication. Yet at the core of this concept is the notion of total personal immunity from governmental control: the right "to be let alone." [35] In 1891, the Supreme Court of the United States embraced Judge Cooley's famous definition of "liberty":

No right is held more sacred, or is more carefully guarded, by the common law, than the right of every individual to the possession and control of his own person, free from all restraint or interference of others, unless by clear and unquestionable authority of law. As

well said by *Judge* Cooley, "The right to one's person may be said to be a right of complete immunity: to be let alone." (emphasis in the original).[36]

More recently the First Circuit in Richards v. Thurston,[37] held that the right of students to determine their personal appearance is implicit in the liberty assurance of the due process clause. There the court said:

We do not say that the governance of the length and style of one's hair is necessarily so fundamental as those substantive rights already found implicit in the "liberty" assurance of the Due Process Clause, requiring a "compelling" showing by the state before it may be impaired. Yet "liberty" seems to us an incomplete protection if it encompasses only the right to do momentous acts, leaving the state free to interfere with those personal aspects of our lives which have no direct bearing on the ability of others to enjoy their liberty. . . . [38]

School Dist., 393 U.S. 503, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969). *Compare* In re Gault, 387 U.S. 1, 13, 87 S.Ct. 1428, 18 L.Ed.2d 527, 538 (1967) *with* Ginsberg v. New York, 390 U.S. 629, 637, 88 S.Ct. 1274, 20 L.Ed.2d 195, 202 (1968). We further cite with approval Judge James E. Doyle's observation:

Cautious counsel to avoid judicial involvement in serious constitutional issues merely because they concern younger people, in my view, is neither prudent, expedient, or just. It is time to broaden the constitutional community by including within its protections young people whose claim to dignity matches that of their elders. Breen v. Kahl, 296 F.Supp. 702, 708 (W.D.Wis.1969).

35. *See* E. Griswold, The Right to be Let Alone, 55 Nw.U.L.Rev. 216 (1960).

36. Union Pacific Ry. Co. v. Botsford, 141 U.S. 250, 251, 11 S.Ct. 1000, 35 L.Ed. 734, 737 (1891). Justice Douglas amplified this interpretation of "liberty" in Olff v. East Side Union High School Dist., 404 U.S. 1042, 1144, 92 S.Ct. 703, 704–705, 30 L.Ed.2d 736, 737 (1972):

The word "liberty" is not defined in the Constitution. But . . . it includes at least the fundamental rights "retained by the people" . . . . .

One's hair style, like one's taste for food, or one's liking for certain kinds of music, art, reading, recreation, is certainly fundamental in our constitutional scheme—a scheme designed to keep government off the backs of people.

37. 424 F.2d 1281 (1st Cir. 1970).

38. *Id.* at 1284–1285. The court went on to make the following observation:

We think the Founding Fathers understood themselves to have limited the government's power to intrude into this sphere of personal liberty, by reserving some powers to the people. The debate concerning the First Amendment is illuminating. The specification of the right of assembly was deemed mere surplusage by some, on the grounds that the government had no more power to restrict assembly than it did to tell a man to wear a hat or when to get up in the morning. The response by Page of Virginia pointed out that even those "trivial" rights had been known to have been impaired—to the Colonists' consternation—but that the right of assembly ought to be specified since it was so basic to other rights. The Founding Fathers wrote an amendment for speech and assembly; even they did not deem it necessary to write an amendment for personal appearance. We con-

Similarly, the Third Circuit reached the same conclusion in Stull v. School Board of Western Beaver Jr.-Sr. H.S.[39]

. . . However, it is our view that the First Circuit's approach [in Richards v. Thurston] was correct; we therefore prefer to follow it and hold that the governance of the length and style of one's hair is implicit in the liberty assurance of the Due Process Clause of the Fourteenth Amendment.[40]

Hairstyles have been the subject of great variety and individual taste and have traditionally been left to personal decision; they are the manifestations of our diverse and numerous individual personalities.[41] The United States of America, and Alaska in particular, reflect a pluralistic society, grounded upon such basic values as the preservation of maximum individual choice, protection of minority sentiments, and appreciation for divergent lifestyles. The spectre of governmental control of the physical appearances of private citizens, young and old, is antithetical to a free society, contrary to our notions of a government of limited powers, and repugnant to the concept of personal liberty. It has been observed that "[t]here are few things more personal than one's body and its appearance, and there could be few laws more destructive of the notion that there is a range of decisionmaking within which the individual is autonomous than a rule regulating physical makeup." [42] Whatever else "liberty" may mean as used in article I, section 1 of the Alaska constitution, we hold that the term at least encompasses the fundamental personal right of students in our public schools to select their own individual hair styles without governmental direction.[43]

clude that within the commodious concept of liberty, embracing freedoms great and small, is the right to wear one's hair as he wishes. 424 F.2d at 1285 (citations omitted).

39. 459 F.2d 339 (3d Cir. 1972).

40. *Id.* at 347.

41. In Richards v. Thurston, 304 F.Supp. 449, 451 (1969) Judge Wyzanski noted the following:

This Court takes judicial notice that hairstyles have altered from time to time throughout the ages. Sampson's locks symbolically signified his virility. Many of the Founding Fathers of this country wore wigs. President Lincoln grew a beard at the suggestion of a juvenile female admirer. Chief Justice Hughes' beard furnished the model for the frieze over the portico of the Supreme Court of the United States proclaiming "equal justice under law." Today many of both the younger and the older generations have avoided the increased cost of barbering by allowing their locks or burnsides to grow to greater lengths than when a haircut cost a quarter of a dollar.

Whether hair styles be regarded as evidence of conformity or of individuality, they are one of the most visible examples of personality. This is what every woman has always known. And so have many men, without the aid of an anthropologist, behavioral scientist, psychiatrist, or practitioner of any of the fine arts or black arts.

42. 84 Harv.L.Rev. 1702, 1711 (1971). In his dissent in Ferrell v. Dallas Indep. School Dist., 393 U.S. 856, 89 S.Ct. 98, 21 L.Ed.2d 125, denying cert. to 392 F.2d 697 (5th Cir. 1968) Justice Douglas wrote:

I suppose that a nation bent on turning. out robots might insist that every male have a crew cut and every female wear pigtails. But the ideas of "life, liberty, and the pursuit of happiness," expressed in the Declaration of Independence, later found specific definition in the Constitution itself, including of course freedom of expression and a wide zone of privacy. I had supposed those guarantees permitted idiosyncrasies to flourish, especially when they concern the image of one's personality and his philosophy toward government and his fellow men.

43. In interpreting our constitution as we do today, we are merely fulfilling our judicial obligation enunciated in Baker v. City of Fairbanks, 471 P.2d 386 (Alaska 1970):

. . . [W]e are under a duty, to develop additional constitutional rights and privileges under our Alaska Constitution if we find such fundamental rights and privileges to be within the intention and spirit of our local constitutional language and to be necessary for the kind of civilized life and

■ While we have concluded that the right of students to fashion their own appearances by wearing their hair in accordance with their own individual preference in public schools is a fundamental constitutional right implicit in the concept of liberty as guaranteed by the constitution of Alaska, we do not hold that such right is absolute.[44] There may be instances in which the state acting through a school administration would be justified in regulating the hair length of its citizenry. We are in accord with the observation made by the court in Bishop v. Colaw[45] that "personal freedoms are not absolute; they must yield when they intrude upon the freedom of others."[46]

Given our conclusion that a fundamental constitutional right is involved in the case at bar, we next consider the impact of such right on the question of the appropriate standard and burden of proof. In this regard, we have previously held that the state's encroachment upon an individual's constitutional rights is justifiable only upon a showing by the government of a compelling interest. More specifically, in Baker v. City of Fairbanks[47] we indicated that:

> If an individual right is vested by the Constitution, the overriding demands of governmental efficiency must be of a compelling nature and must be identifiable as flowing from some enumerated constitutional power.[48]

The compelling interest standard is not a novel requirement in constitutional law,[49] and has often been invoked by the United States Supreme Court in determining the validity of state regulations which violate fundamental federal constitutional rights. The use of this standard of proof is exemplified in *Griswold.*

> In a long series of cases this Court has held that where fundamental personal liberties are involved, they may not be abridged by the States simply on a showing that a regulatory statute has some rational relationship to the effectuation of a proper state purpose. "Where there is a significant encroachment upon personal liberty, the State may prevail only upon showing a subordinating interest which is compelling," . . . (citations omitted).[50]

■■ We think the compelling interest standard has merit and should be adopted in cases where a person's individual liberty, as guaranteed by the Alaska constitution, allegedly has been encroached upon.[51] In applying this criterion to the issues in the

ordered liberty which is at the core of our constitutional heritage. 471 P. 2d at 402 (footnote omitted.)

44. The Eighth Circuit observed in part in Bishop v. Colaw, 450 F.2d 1069 (8th Cir. 1971) that:
> Of the justifications advanced by the school administrators in support of the regulations, only those relating to swimming pool sanitation and shop class safety bear any rational relation to the length of a student's hair. The school administration has failed to show why these particular problems cannot be solved by imposing less restrictive rules, such as requiring students to wear swimming caps or shop caps. 450 F.2d at 1077.

We are also in agreement with Smith's and the School Board's position that:
> Students cannot be permitted to attend class with contagious diseases, armed with dangerous weapons, or unclothed. Neither can they be permitted to speak at will.

45. 450 F.2d 1069 (8th Cir. 1971).

46. *Id.* at 1075.

47. 471 P.2d 386 (Alaska 1970).

48. *Id.* at 394.

49. *See, e. g.*, Dunn v. Blumstein, 405 U.S. 330, 92 S.Ct. 995, 31 L.Ed.2d 274 (1972); Dunham v. Pulsifer, 312 F. Supp. 411 (D.Vt.1970).

50. 381 U.S. 479, 497, 85 S.Ct. 1678, 14 L.Ed.2d 510, 523 (1965). *See also* Shapiro v. Thompson, 394 U.S. 618, 638, 89 S.Ct. 1322, 22 L.Ed.2d 600, 617 (1969).

51. In accord with our holding is the conclusion reached in Note, 55 Iowa L.Rev. 707 (1971):
> Since the wearing of long hair may be important to the identity and dignity of students, it should be given consti-

case at bar we must determine whether the record disclosed a compelling government interest necessitating the abridgment of the student's constitutionally protected right to fashion his own personal appearance. Once a fundamental right under the constitution of Alaska has been shown to be involved and it has been further shown that this constitutionally protected right has been impaired by governmental action, then the government must come forward and meet its substantial burden of establishing that the abridgment in question was justified by a compelling governmental interest.

We recognize that courts in other jurisdictions have adopted different standards of proof in litigation of this character and have allocated burdens of proof in divergent ways. Some have imposed upon the state a "substantial burden of justification," under which the state must show the furtherance of an "important or substantial governmental interest." [52] Other courts have employed the so-called "traditional" equal protection test, and have required that the state merely demonstrate the exist-

ence of a "rational basis" for its regulation encroaching upon a student's constitutional rights.[53]

Smith and the School Board contend that this court should adopt as an appropriate standard of proof the formula articulated by Justice Harlan in his dissenting opinion in *Tinker*:

> . . . I would, in cases like this, cast upon those complaining the burden of showing that a particular school measure was motivated by other than legitimate school concerns. . . . [54]

■ Since we have held that the right "to be let alone"—including the right to determine one's own hairstyle in accordance with individual preferences and without the interference of governmental officials or agents—is a fundamental right under the constitution of Alaska, we reject the test proposed by Justice Harlan. Adoption of his standard would make this fundamental constitutional right dependent upon the subjective elements of motivation and good faith of school administrators.[55]

tutional protection as [a] fundamental interest under the due process clause.

If the student's choice of hair style is regarded as an interest entitled to special protection under the due process clause, the state must have a compelling subordinating interest in regulations, and the state must bear a substantial burden of justification. 55 Iowa L. Rev. at 710 (footnote omitted).

52. *See, e. g.*, Breen v. Kahl, 419 F.2d 1034, 1036 (7th Cir. 1969), cert. denied, 398 U.S. 937, 90 S.Ct. 1836, 26 L.Ed.2d 268 (1970) ; Crews v. Cloncs, 432 F.2d 1259, 1263 (7th Cir. 1970).

Courts adopting this standard have been defining "substantial burden of justification" in accordance with the language of United States v. O'Brien, 391 U.S. 367, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968) :

. . . [A] government regulation is sufficiently justified if it is within the constitutional power of the Government; if it furthers an important or substantial governmental interest; if the governmental interest is unrelated to the suppression of free expression; and if the incidental restriction on alleged First Amendment freedoms is no

greater than is essential to the furtherance of that interest. 391 U.S. at 377, 88 S.Ct. at 1679, 20 L.Ed.2d at 677. *See* Note, 84 Harv.L.Rev. 1702, 1705 n. 19 (1971).

53. *See, e. g.*, Miller v. Gillis, 315 F.Supp. 94, 100 (N.D.Ill.1969). Smith and the School Board urge that we adopt a test which would sustain the validity of the hair length regulation if persuaded that such regulation bears a rational relation to a constitutionally permissible objective.

54. 393 U.S. at 526, 89 S.Ct. at 747, 21 L.Ed.2d at 749 (Harlan dissenting).

55. We are not unmindful of Justice Brandeis' warning in Olmstead v. United States, 277 U.S. 438, 48 S.Ct. 564, 72 L.Ed. 944 (1928) (dissenting opinion), that good faith and lofty motivations often conceal the greatest danger to liberty.

Experience should teach us to be most on our guard to protect liberty when the government's purposes are beneficent. Men born to freedom are naturally alert to repel invasion of their liberty by evil-minded rulers. The greatest dangers to liberty lurk in insidious encroachment

In short, we think adoption of the compelling interest standard best comports with the kind of ordered liberty which represents the core of Alaska's constitutional heritage and will afford the necessary degree of protection against attempted infringement of the students' individual constitutional right involved in this litigation.

Breese established the existence of a fundamental constitutional right and the encroachment thereof by the school hair regulation. We hold that on this record, Smith and the School Board have failed to prove that their interest in promulgating the hair length regulation is compelling.[56] In their attempt to justify the rule, Smith and the School Board produced lay opinion testimony, unsupported by figures or statistics, on the relationships between long hair and disruptive behavior and between long hair and academic performance. That testimony included a few references to specific disturbances involving students with long hair. Absent from the appellee's proof, however, were "hard facts"[57] pertaining to the causal relationship between appearance and behavior. No empirical studies were offered. No testimony from experts such as psychologists or psychiatrists was introduced.

Instead, Smith testified that his primary objection to long hair being worn by male students was that it was a deviation from the norm of appearances and caused distractions and disruptions within the school system. He further testified that he believed that good grooming improves personal behavior, that the student with long hair has a poor self-image and consequently his personal behavior is not what it could be, that the long haired student is negative, defensive and in trouble, and that there is a very direct relationship between personal appearance and behavior. Smith

by men of zeal, well-meaning but without understanding. 277 U.S. at 479, 48 S.Ct. at 572–573, 72 L.Ed. at 957.

56. Ordinarily, the imposition of a new standard and burden of proof by an appellate court necessitates the remanding of a case on appeal for further proceedings in conformity with the new test. This sound judicial policy seeks to avoid any unfairness and surprise to the parties. Here, however, it is unnecessary to remand the instant case for further proceedings under the "compelling interest" test since the justifications underlying the remand policy do not exist. Smith and the School Board are not unfairly affected by the instant standard since they have presumably introduced their best available evidence at trial; that is, their case would remain the same and would not vary with different evidentiary formulae. Nor are they unduly surprised since Breese initially pleaded the existence and violation of a fundamental constitutional right, and since federal and Alaska authorities have in the past invoked the compelling state interest standard of proof when such rights have been violated. Furthermore, we note that other appellate courts which invalidated hair length regulations have not, as a matter of practice, remanded cases for further proceedings under newly imposed standards of proof. *See, e. g.,* Stull v. School Bd. of Western Beaver Jr.-Sr.

H. S., 459 F.2d 339 (3d Cir. 1972); Bishop v. Colaw, 450 F.2d 1069 (8th Cir. 1971); Richards v. Thurston, 424 F.2d 1281 (1st Cir. 1970); Breen v. Kahl, 419 F.2d 1034 (7th Cir. 1969), cert. denied, 398 U.S. 937, 90 S.Ct. 1836, 26 L.Ed.2d 268 (1970); Laine v. Dittman, 125 Ill.App.2d 136, 259 N.E.2d 824 (1970).

57. We note that there is a trend in long hair cases towards requiring the production of "hard facts" in order to justify school regulations. One scholar observes that:

These hair and dress cases, as well as *Tinker,* also exhibit the final and most important trend discussed here: the increasing demand that [a] school administration justify a regulation, not by conjecturing about the adverse consequences to the educational structure without the rule, but by presenting *hard facts.* Contrary to the beliefs of many people, the courts are not so much saying that the schools cannot act to achieve traditional aims—to prevent disruption, for example—but they are saying that they will no longer take an administrator's unsupported word that absent a given rule, regulation, or procedure, disruption will take place.

Goldstein, Reflections on Developing Trends in the Law of Student Rights, *supra* note 19, at 617 (emphasis added).

also testified that university students with long hair had caused an "excitement" when they visited his school, that he was informed of an instance in which a classroom fight between two boys broke out after one called the other a "pretty boy," and that he had overheard students who were observing Breese in the hallway say, "isn't he cute" and laugh. A mathematics teacher from Main testified in defendants' behalf and stated that on one occasion, Breese had caused a minor disruption in her class when he got his hair caught in the pins on her bulletin board. The assistant principal of Main testified that in his professional opinion, long haired students are proportionately more of a disciplinary problem than short haired students. He further stated that he believed the long hair of a student could cause a disruption, could become a disciplinary problem. A counselor at Main testified that two boys in her room had caused a disruption by saying that "my hair is longer than yours" and by pulling on each other's hair and fighting. Another counselor from Main, who was also a priest and possessed considerable teaching and administrative experience, testified that when he was a principal at another high school, he experienced more disciplinary problems with students on "hobo day," a special occasion on which the school dress code was relaxed and students were allowed to wear old clothes. He later admitted, however, that the increased unruly behavior on "hobo day" might have been a function of the holiday atmosphere. He further testified that in his professional opinion, there could be a relationship between long hair and behavior and disciplinary problems. An English teacher at Main testified that the title of the play *Hair* perhaps has some relationship with an attitude of protest, that long hair on a student interferes with teaching by preventing "eye contact," and that a student who is constantly flipping his hair back or moving it back out of his eyes creates a distraction. Another English teacher from Main gave her opinion that students' long hair and their behavior "go to-

gether." A teacher testified that "I've had more combs in my classroom lately than I've seen in a chicken yard." Finally, a juvenile officer of the Fairbanks police department testified that probably more than half of the juvenile males with whom he came into contact had long hair. He acknowledged, however, that "contacts" and "juveniles" were not synonymous, and that the police department kept no figures, percentages or statistics on the length of hair of juvenile offenders.

This evidence offered by Smith and the School Board to justify the hair length regulation, however, was not uncontroverted. Breese offered both lay and expert opinion testimony that rebutted the evidence presented by appellees. Breese's father testified that he wanted his son to have long hair and that he believed his son had a right to wear long hair since the youth was not infringing anyone else's rights. A biology teacher from Lathrop High School testifying in Breese's behalf stated that long haired students did not cause discipline problems, and that they were among the academically superior students who took his advanced biology course. A social studies teacher from Lathrop testified that she could not tell any difference between long and short haired students in deportment, grades, attitude or anything. She further testified that long haired males in her classes did not cause distractions or create disruptions but opined that crew cut males might create a disturbance. A current events and "American Minorities" teacher from Lathrop testified that she could not see any difference in behavior between the male students in her classes with long hair and those with short hair, and that she did not tend to have more long haired people in her special classes for "underachievers." A French and social studies teacher from Ryan Junior High gave testimony that she could see no relationship at all between her students' long hair and their behavior. She further testified that the length of a male student's hair had never led to distractions in her class, that long haired stu-

dents were no better or worse achievers than short haired students, and that long haired students did not give her any more trouble than short haired students. A psychologist who worked in a Fairbanks mental clinic for five years gave her expert opinion that there was no cause and effect relationship between the length of hair and the behavior problems of a child, and that short haired and long haired kids got into trouble with equal frequency. She also testified that her own son, a high school student who wore long hair, was a semi-finalist in the national merit scholarship competition. An assistant professor of education at the University of Alaska, who is a registered psychologist in the state of Alaska, gave his expert opinion that there is no direct causal relationship between hair length and behavior. He further testified that in no case could he actually correlate, let alone find a causative relationship between hair length and personality. Finally, a seventh grade student from Main testified that in the class she shared with Breese, the latter's hair created no distractions and caused no disruptions or talk.

We express no view as to the nature or exact amount of evidence necessary to establish the existence of a compelling state interest. Rather, we conclude only that on the basis of the entire record in the case at bar, Smith and the School Board did not meet the requisite burden of showing a compelling justification for the Main Junior High School hair length regulation. In the absence of any compelling justification, we hold that the school hair length regulation impermissibly infringed upon Breese's constitutional right under Alaska's constitution which guaranteed him the liberty of personal choice as to appearance.

Several courts have found regulations more acceptable where some sort of intra-school "procedure for review of any punishments" has been provided.[58] Similarly, Smith and the School Board argue that the fact that the Board is "democratically elected" acts as a "brake" upon unreasonable and arbitrary actions of schoolmen.[59] In the case at bar the hair regulation was promulgated by a single school official, and was based on his conception of fashion. Even if such a regulation were arrived at and promulgated by a more democratic process, a student's claim to liberty would remain undiminished, for this court is held to a standard of vigilance in the matter of the protection of an individual's constitutional liberties. Protection of personal liberty cannot be left to depend upon the will of the majority for those are antithetical concepts.[60] The tension between the notions of liberty and majority rule is illuminated by Judge Mann in Conyers v. Glenn.[61]

58. *See, e. g.*, King v. Saddleback Junior College Dist., 445 F.2d 932, 935 (9th Cir. 1971).

59. We agree that courts should not be too quick to interfere with the functions of other public agencies, such as school boards. In this regard we are not unmindful of Epperson v. Arkansas, 393 U.S. 97, 89 S.Ct. 266, 21 L.Ed.2d 228 (1968), where the Supreme Court of the United States per Justice Fortas said:
     Judicial interposition in the operation of the public school system of the Nation raises problems requiring care and restraint. . . . By and large, public education in our Nation is committed to the control of state and local authorities. Courts do not and cannot intervene in the resolution of conflicts which arise in the daily operation of school systems and which do not directly and sharply implicate basic constitutional values. 393 U.S. at 104, 89 S.Ct. at 270, 21 L.Ed.2d at 234 (footnotes omitted).
     *See also* Conyers v. Glenn, 243 So.2d 204, 209–210 (Fla.App.1971).

60. In this regard we note our reluctance to adopt a viewpoint that would sustain a hair length regulation because the length of an individual's hair caused the majority or a substantial number of others to be disorderly. As Professor Zecheriah Chaffee, Jr., wrote in Free Speech in the United States (1941) 151–52. it is absurd to punish a person "because his neighbors have no self-control and cannot refrain from violence."

61. 243 So.2d 204 (Fla.App.1971).

The order appealed from is grounded on the theory that parental authority has been transferred by the will of the majority to the board, and that the board has authority to prescribe the students' dress. The corollary of this proposition is that if these long-haired young, grown to legal age, sufficiently persuade their fellow citizens to elect, by a bare majority, a bare majority of a school board, then that governmental body shall have the authority, by vote of its new majority, to suspend the student who cuts his hair during the term.

. . . We would surmise that many who are not offended in the slightest by the imposition of the collective will on the long-haired boy of today would be early advocates of the short-haired individual's right to be different in a long-haired society.[62]

Similarly, the tension between personal liberty and majority will would not be eliminated by the fact that hair regulations were promulgated by some democratically elected, intra-school body. An attempted justification of this nature was properly rejected by the Seventh Circuit in the very recent case of Arnold v. Carpenter,[63] where the court stated:

We conclude that the democratic process used in adopting the code does not per se justify the denial of [the students'] constitutional right to wear his hair in the mode he chooses.[64]

The superior court's judgment is reversed and the case remanded with directions to enter a judgment in conformity with this opinion.

Reversed and remanded.

BOOCHEVER, J., not participating.

ERWIN, Justice (concurring).

I regret that I am forced to dissent from the reasoning expressed even though I agree with the result in this case. "I have no objection, dislike or distaste for any particular hair style worn by either male or female of any age. My acceptance of the hair styling of other human beings is tempered by my thinking that whatever the style it should be clean, reasonably neat (whatever that means, and present no danger to. the health or safety of the individual or to others." [1]. In the case at hand, there appears to be no question but that the hair in question was clean, neat and presented no danger to the health or safety of Breese or anyone else.

But the length or style of Michael Breese's hair is not the issue here. It is rather the nature and scope of the power of the school board—more precisely, the limits of that power. Traditionally, the board's power has rested on the common law doctrine of *in loco parentis*. William Blackstone has provided us with what is perhaps the classic statement of this doctrine:

"[A parent] may also delegate part of his parental authority, during his life, to the tutor or school master of his child; who is then *in loco parentis,* and has such a portion of the power of the parent committed to his charge, *viz* that of restraint and correction, as may be necessary to answer for the purposes for which he is employed." [2]

Thus the board's authority must be delineated on the basis of subtle distinctions de-

---

62. *Id.* at 205–206.

63. Arnold v. Carpenter, 459 F.2d 939 (7th Cir. 1972). *See also* Bishop v. Colaw, 450 F.2d 1069, 1077 (8th Cir. 1971) (where the dress code had been accepted by the majority of the school community) ; and Massie v. Henry, 455 F.2d 779 (4th Cir. 1972) (where the long hair regulation had been "recommended by a student-faculty-parent committee."). *Compare* Wood v. Alamo Heights Indep.

School Dist., 308 F.Supp. 551 (W.D. Tex.1970).

64. 459 F.2d at 943.

1. Murphy v. Pocatello School District #25, 94 Idaho 32, 480 P.2d 878, 884 (1971) (Shepard, J., dissenting). I am indebted to Justice Shepard for this forceful expression of views which reflect strongly my feelings on this issue.

2. 1 W. Blackstone, Commentaries 453.

rived from the functions that society has given it to perform. Today the situation has changed somewhat and the modern school board is a public agency operating under a legislative grant of authority. While the statutory delegation of school board authority is exclusive, the statutory scheme must nevertheless be read against the background of the common law rules.[3]

The American community groups together in its schools hundreds, even thousands, of energetic, volatile and sometimes aggressive young people in close contact with one another and in confined areas, during a substantial part of each school day for three-fourths of each year and twelve years of their lives.

The bare process of teaching them in the traditional sense demands the best that the profession can offer. But in addition we call upon the schools to give our children driver training, vocational skills, public speaking, music instruction, and sex education, and to maintain their physical fitness, to carry on ever broadening athletic programs, engage in fund raising, and plan, produce and chaperone social events.

Citizens expect and demand that their children be physically safe in the schools to whose supervision they are consigned, and the citizenry is outraged if the schools are less than safe and orderly. At the same time we expect that the requirements of order, and of protection and implementation of the educational program of the school, will be met by limited enforcement means—the force of the school establishment itself and the school-related disciplines of reprimand, suspension, and expulsion—recognizing that the schoolroom is an inappropriate place for the policeman to be, whether called or needed.

Just as we do not expect parents to be perfect, recognizing that a certain amount of trial and error is necessary for the development of both the parents and the child, we cannot rationally demand perfection from the school. Each year, as the makeup of a school class changes, the same trial and error process is necessary to establish an atmosphere for teaching. The initial guidelines provide a basic starting point for teachers and students alike to assess each other and to establish a working relationship. In measuring the appropriateness and reasonableness of school regulations against constitutional protections, the courts must give full credence to the role and purposes of the schools and of the tools with which they must deal with their problems. The courts must be careful to recognize the differences between what are reasonable restraints in the classroom and what are reasonable restraints on the street corner. This is not to say, however, that there are no limits to board authority. Indeed, there must be (just as there must be limits on parental authority).

The majority opinion balances these interests by placing the burden of a school board of justifying each regulation which restricts any constitutional right of a student to establish a "compelling state interest" before the regulation will be upheld. I feel that the majority has placed the wrong burden on the wrong party. I view of the nature and function of the school board in the present day educational process, I am strongly of the opinion that it is the student who should bear the burden of showing that a particular rule bore no reasonable relationship to the purpose for which it was promulgated. This reasonable relationship "must be an obvious and real connection between the regulation and its purpose. . . ."[4]

The effect of the majority opinion is to tightly constrict board authority at a time when citizens are demanding more from

3. Goldstein, The Scope and Sources of School Board Authority to Regulate Student Conduct and Status: A Non-Constitutional Analysis, 117 U.Pa.L.Rev. 373, 384 (1969).

4. State v. Also, 11 Ariz.App. 227, 463 P.2d 122 (1969).

the school. This could bring the educational process to a ponderous halt:

"Some lines must be drawn. To challenge such lines by the 'compelling state interest' standard is to condemn them all. So far as I am aware, no state law has ever satisfied this seemingly insurmountable standard, and I doubt one ever will, for it demands nothing less than perfection.[5]

This court is in a difficult position to judge the needs of local school districts scattered over the reaches of Alaska. Their problems are as diverse as the inhabitants and the climate. Innovation and experimentation have been the order of the day as local schools met local problems. I fear the perfection we now require will greatly limit this at a time when we most need new ideas and approaches to solve our basic problems. The board may spend *its time repetitively justifying its legitimate* authority rather than solving its problems.

However, the application of a burden such as I have proposed would not have changed the result in the case at bar. The school board, in its arguments both below and on appeal, *limited* its justification of the instant rule to a claim that the regulation of hair length was conducive to good academic performance and deportment.[6] Highly qualified expert testimony brought forth by appellant was unanimous in denying that there was any "obvious and real connection" between the length of hair and academic performance or deportment. We have not been cited to nor have we found any medical authority which refutes this testimony.[7] It is on this very narrow basis that I concur in this case.

5. Dunn v. Blumstein, 405 U.S. 330, 92 S.Ct. 995, 31 L.Ed.2d 274, 296 (1972), Chief Justice Burger, dissenting.

6. A further issue of direct relevance to the type of rule promulgated here arises on the passage of the sexual discrimination amendments to both the federal and state constitutions. However, the point was not raised and was not considered by the court.

7. The adoption of regulations concerning dress and style can, perhaps, be reason-ably related to health, safety, or character development. However, common sense dictates that such regulations should be adopted only with both student and parent participation in order to insure an even approach to the problem, to avoid the possible prejudices of any one individual, and to insure both respect and understanding of the regulations. *See* King v. Saddleback Jr. College Dist., 495 F.2d 932, 934–935 (9th Cir. 1971).